EMERY, ETC., ET AL. *v.* F. P. ASHER, JR., & SONS, INC.

[No. 193, October Term, 1949.]

2

4

*Decided July 19, 1950.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, and HENDERSON.

*Earl H. Davis* and *Maurice Weidemeyer* for the appellants.

*Robert D. Bartlett* and *William J. McWilliams* for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Norman B. Emery and Lonnie E. Polson, two bricklayers, plaintiffs below, from judgments for costs rendered on verdicts by a jury in favor of F. P. Asher, Jr., & Sons, Inc., defendant below, appellee here, in automobile accident cases resulting in personal injury to appellants and property damage. The cases were tried together.

On January 8, 1949, the appellants were passengers in a Kaiser automobile being driven by Polson, and owned by Emery, on the Central Avenue road from the District of Columbia to Annapolis between 6:00 and 6:30 A.M. They planned to spend that day in a duck blind on the South River near Annapolis. At that time it was still dark. After the automobile had rounded a right-hand curve in the road and had come onto a straight stretch in the highway the headlights showed an obstruction on the highway. This obstruction, with which their automobile collided, proved to be a tractor-trailer combination owned by the appellee, the rear end of which was against an embankment on the south side of the highway for the purpose of loading on the trailer a bulldozer for transportation to another location. The front of the tractor was facing north across the highway.

After each side had exhausted its four strikes and twelve persons were seated in the jury box, the appellants requested permission to examine the prospective jurors on their *voir dire* and, on refusal, submitted ten questions to be propounded to them. The trial judge personally asked the twelve prospective jurors two of the questions submitted, one being: "Are you, or any members of your immediate family, employed by the defendant corporation?" The other question asked by the trial judge was: "Do you know anything about the facts of this accident, either from personal knowledge or from having read of same in the newspapers?" The trial judge refused to ask the prospective jurors, as requested, whether they knew either of the plaintiffs; either of the counsel for plaintiffs; Mr. Asher, any of his sons, or other officers of the de-

fendant corporation; or any of the counsel for the defendant. The trial judge also refused to ask them whether they were bricklayers by trade; whether they had participated in litigation arising out of a motor vehicle collision, either as plaintiffs or defendants; whether any other reason suggested itself to them, which might embarrass them as jurors; and whether they could render a fair and impartial verdict, based upon the evidence alone, "and the law as the court shall give it to you?" The appellants argue that these refusals constitute reversible error.

It has been definitely held by this Court that it is proper for the court to propound submitted questions to jurymen. *Handy v. State,* 101 Md. 39, 43, 44, 60 A. 452, 109 Am. St. Rep. 558; *Whittemore v. State,* 151 Md. 309, 312, 134 A. 322. Chief Judge Bond, in *Whittemore v. State, supra,* said, beginning, 151 Md. at page 313, 134 A. at page 323: "This court, in *Handy v. State,* quoted several decisions in English and American courts, opposing examinations of jurymen which they characterized as speculative, inquisitorial, catechizing, or fishing, to aid in deciding on peremptory challenges, and definitely decided that this was improper. Judge Pearce, writing the opinion for the court, said: ' We are aware that there are decisions to the contrary in other courts of equal authority and reputation, but such knowledge as we possess of the experience in practice under those decisions does not commend them to our adoption,'—in this referring, presumably, to reports from other jurisdictions of seemingly unreasonable incumbering and prolongation of the work of securing a jury to proceed with trial. It is true, as counsel points out, that the court in *Handy v. State* held that whether the juryman questioned was or was not a married man was immaterial, so that the particular question asked was objectionable because of that fact, but that holding does not detract from the fact that the court decided that questions not specifically directed to some reasonable cause for disqualification, and so, merely for peremptory challenge, should not be asked.

And see *Gillespie v. State,* 92 Md. 171, 174, 48 A. 32."
The examination of a juror which a party is entitled to
have made is for the purpose of ascertaining the existence
of cause for disqualification and for no other purpose.
*Cohen v. State,* 173 Md. 216, 224, 195 A. 532, 196 A. 819.

The appellants rely on the case of *Alexander v. R. D.
Grier & Sons Co.,* 181 Md. 415, 419, 30 A. 2d 757, 758.
In that case the liquidator of Keystone Indemnity Ex-
change sought to enforce an assessment against a sub-
scriber. The liquidator asked to examine the jurors on
their *voir dire* on the question "as to whether or not they,
or any of their immediate families, are assessables in the
Keystone Indemnity Exchange." The trial judge refused
the request. This Court, in reversing the case held that
the fact that a prospective juror or a member of his im-
mediate family was an "assessable" in the Keystone
would create bias or prejudice in the juror's mind. His
financial interest "would theoretically incline him in
favor of recovery of verdict for the Liquidator". On the
other hand, he "might feel that the whole plan of assess-
ment was unjust and inequitable and his sympathy be
with the defendant policy holder." In either event the
juror would not be impartial. In *Morford v. United
States,* 339 U. S. 258, 70 S. Ct. 586, the panel for selection
of jurors consisted almost entirely of government em-
ployees in Washington. The petitioner sought to examine
these on their *voir dire* with reference to the possible
influence of the Federal "Loyalty Order". The Supreme
Court held that such an examination should have been
permitted. See also *Dennis v. United States,* 339 U. S.
162, 70 S. Ct. 519, 523.

The special questions which the trial judge here re-
fused to propound to the jury do not appear, as ap-
peared in the last two cases reviewed, to have been neces-
sary for a fair and impartial trial to which, of course,
the appellants were entitled, on the issues here presented.
The questions refused appear to be more or less specula-
tive or "fishing" and such as not to test the eligibility
of the prospective jurors. The appellants admitted dur-

ing argument in this Court that they knew of no juror who sat in the case who would have been disqualified if the proposed questions had been asked. We cannot say that the trial judge abused his discretion.

During the trial appellant Polson testified as to the injuries received by him as a result of the accident in this case. In the declaration he alleged permanent injuries, future hospital and medical care and future loss of earnings as a union bricklayer. Doctors had been called by Polson who testified as to the extent of his injuries and doctors who had examined him were called by the defendant to testify as to the result of X-ray pictures taken of his back. Polson had called his employer as a witness who had testified the amount of time Polson worked prior to the accident and six months afterwards. Polson testified that from the date of his accident until March 23rd when his cast was removed he "couldn't get around", when he laid down "it hurt me". In other words, testimony had been offered to show Polson's physical condition, as late as six months after the accident and even up to the time of trial, which he attributed to the accident. During his direct examination he testified that after receiving surgical treatment, the only physician other than Dr. Saracy who had cared for him was Dr. Pelland. Polson and his counsel at that time knew that Polson had been struck over the head by a pistol in February, 1949. On cross-examination Polson was asked whether he was treated by any other doctor in February, 1949. This was during the time he claimed disability. Appellant Polson objected to the question unless it was limited to injuries arising out of the automobile accident. The trial judge overruled the objection and Polson testifying as to that occurrence said that he was treated for cuts on his head when "a fellow thought I owed him some money, and I didn't. So he tried to take my money, and I wouldn't give it to him. So he had his hand in his pocket, like this (indicating) and I thought he had a gun. So I grabbed at him. Due to the fact that I had my cast on,

I couldn't get around. He pulled a gun out and beat me across the head with it and had me down on the pavement. I couldn't get up." He further said that these injuries did not aggravate the injuries sustained in the automobile accident. Appellant Polson claimed that the trial judge should not have allowed this evidence to be presented on cross-examination without requiring the defendant to make Polson his own witness for that purpose and that such evidence was prejudicial. With this contention of the appellant we do not agree. The plaintiff had offered testimony as to his physical condition before the accident and as to his condition for six months after the accident. It was certainly proper for the defendant to ascertain whether anything had happened to the plaintiff in the meantime to aggravate the originally claimed injuries or had caused the pains from which he claimed he was suffering. Of course, where a general subject has been gone into in the examination in chief, the cross-examining counsel may ask any relevant question on that general subject. *Armiger v. Baltimore Transit Co.*, 173 Md. 416, 423, 196 A. 111; *Williams v. Graff*, 194 Md. 516, 522, 71 A. 2d 450, 452, 453.

The appellant offered as an expert witness, Sgt. Walter R. Ostrom, of the Accident Investigation Unit of the Washington Police Department. Polson had admitted that just before the collision he was driving the automobile "around 50 miles an hour", which was the legal speed limit on that road. Sgt. Ostrom testified that a motor vehicle traveling 50 miles per hour is moving at the rate of 74 feet per second. Appellant then proffered to prove by this witness the normal reaction time, the stopping distance on this road, and other scientific deductions. This proffer was refused by the trial judge and we think properly so. Appellant assigns this refusal as error. This proffer did not take into consideration the fact that this accident occurred at night on a road that Polson did not know whether he had ever traveled before and the fact that Polson did not know whether his

headlights were depressed down or shining "full distance ahead". The proffer was not based on the proper hypothesis or basis. *Bozman v. State to use of Cronhardt,* 177 Md. 151, 156, 157, 9 A. 2d 60; *Parker v. State,* 189 Md. 244, 248, 55 A. 2d 784. This proffer apparently attempted to show that the automobile was traveling at the rate of 40 miles an hour when Polson applied his brakes although Polson testified he was traveling at the rate of around 50 miles per hour at that time. This would hardly have been helpful to the jury on the question of contributory negligence on the part of Polson, which was the theory on which it was offered.

The appellants further assign as error the refusal of the trial judge to permit them to offer in evidence the fact that the defendant could have loaded the bulldozer on the tractor-trailer at some other point adjacent to the traveled highway, and a short distance away, without having blocked the highway. This testimony was properly refused as it would have had no bearing on the negligence of the defendant at the time and place of the accident or on any other issue before the jury in this case.

After the trial had proceeded for two days there had developed quite a dispute as to the distance of the line of visibility from the curve, around which appellants came just before the collision, to the point of collision, and the true length of the straight-of-way from the east end of the curve to the place of collision. Mr. F. P. Asher, Jr., testified that on December 15, 1949, he went to the scene of the accident in this case with Mr. Fayette M. Latham, Jr., an engineer and surveyor, with Mr. Armiger, who was Asher's superintendent, Mr. Greathouse, the man who was operating the bulldozer at the time of the accident, and Mr. Moreland, who drove Mr. Polson to the hospital after the accident and the exact point in the road where the accident occurred was determined and this place was pointed out to Mr. Latham, in the presence of Mr. Davis, one of the attorneys for the appellants. Mr. Asher further testified that the contour, the natural and physical condition of the road and the straight-of-way

at the scene of the accident had not been changed since the date of the accident, January 8, 1949. Gravel had been put on the road and the road had been graded. The curve had not been changed in any degree. The approaches north and south, east and west were the same and the road was of the same width. The next morning, Mr. Latham went to the scene of the accident, as pointed out to him the day before, and stationed a man in the center of the road where the collision happened and marked the point on a plat. He then drove down the road well past the curve, turned around and came back down the road until he first saw the man standing in the road at the scene of the accident. He stopped his car, marked the spot on the side of the road and marked it on the plat as the "point of vision". He testified that "the absolute straight line sight line distance is 740 feet". He further testified that the plat which he then made and which was offered in evidence correctly delineated the right-of-way line of the road or curve. Appellants claim as error the admission of this plat in evidence and the testimony of Mr. Latham as to his observations because they were made in daylight, not under the same circumstances, and because they were made from places indicated to him by the defendant out of the presence of plaintiffs. As previously set forth, testimony had been offered that the width of the road and the line of the curve had not been changed. Testimony had been previously offered that persons at the scene when the accident happened pointed out the point of collision to Mr. Latham and that one of appellant's attorneys was present at the time. We find no error in the admission of the plat and Mr. Latham's testimony. This was admitted merely to show the *line* of vision, not what could or could not be seen.

Mr. Asher having testified in chief was asked on cross-examination by Mr. Davis whether little spherical shaped containers of kerosene were placed and lit to indicate the obstruction made by the tractor-trailer on Central Avenue. He answered: "I say we didn't need it". Mr.

Davis then asked for a "yes" or "no" answer and the judge stated: "The Court can't compel him to answer that way." Appellant assigns this as error. This claimed error and the refusal of part of appellants' seventh prayer seem to be based on appellants' contention that Article 66½, Section 240(b), (1947 Supplement Code), was applicable to this situation. This section provides that when such a vehicle as was involved in this case "or its lighting equipment *is disabled* during the period when lighted lamps must be displayed on vehicles and such vehicle cannot immediately be removed from the main travelled portion of a highway outside of a business or residence district, or when any *disabled* vehicle described in sub-section (a) is parked on the highway in such position near the crest of a hill or curve as to create danger to other users of the highway, the driver or other person in charge of such vehicle shall immediately cause such flares, lanterns, or other signals to be lighted and placed upon the highway one at a distance of approximately 100 feet in advance of such vehicle, one at a distance of approximately 100 feet in the rear of such vehicle, and the third upon the roadway side of such vehicle, except that if the vehicle is transporting inflammables, three brilliant red reflectors in lieu of other signals, shall be placed adjacent to any such last mentioned vehicle." (Emphasis supplied). There is no evidence in this case that the tractor-trailer or its lighting system was in any way disabled. In fact, testimony had been offered that the tractor-trailer and the bulldozer were "all lit up." The trial judge held that Article 66½, Section 240(b), *supra*, did not apply to this case, as neither the vehicle nor its lighting system was disabled. The interpretation of the statute was a question for the court. *Vogelsang v. Sehlhorst*, 194 Md. 413, 419, 71 A. 2d 295, 298, and we are of the opinion that the court's interpretation was correct. The legislature specifically limited this section to disabled vehicles or disabled lights. The Courts have no power to abrogate this limitation. In *Marshall v. Sellers*, 188 Md. 508, 53 A. 2d 3, relied

on by the appellants, the fuse blew out on the truck disabling the lights. Therefore, that case is not in point. The trial judge granted the remaining part of plaintiff's seventh prayer based on Code, 1947 Supplement, Article 66½, Section 240(a) relating to the failure of defendant to carry flares in the tractor-trailer. He also instructed the jury on Section 240(a), *supra*.

The plaintiff's sixth prayer was based on that part of Code, 1947 Supplement, Article 66½, Section 190(a) forbidding the stopping, standing, or parking of vehicles in certain places alongside or opposite a street excavation or obstruction. There was no evidence in this case to make that section applicable to defendant's vehicle, and the prayer was properly refused. Parts of the eighth prayer, referring to a situation where a red light signal is placed, were based on two cases, one from California and the other from the State of Washington. There was no evidence in this case to support the rejected parts of this prayer, which were properly refused.

Plaintiffs' third and fourth prayers, which were properly refused by the trial judge, undertook to define "proximate cause". The trial judge in his charge instructed the jury fully on the law of negligence of the defendant and contributory negligence on the part of the plaintiffs, which were the issues involved. As we find no error, the judgments will be affirmed.

*Judgments affirmed, with costs.*