## FALCONE *v.* PALMER FORD, INC.

[No. 355, September Term, 1965.]

*Decided May 24, 1966.*

The cause was argued before HAMMOND, HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Joseph A. Mattingly* for appellant.

*William M. Canby,* with whom were *Miller, Miller & Canby* on the brief, for appellee.

Brief Amicus Curiae filed by Automobile Trade Association of Maryland, Inc. (Buckmaster, White, Mindel & Clarke and Everett L. Buckmaster on the brief) ; by The Maryland Bankers Association (Venable, Baetjer & Howard, Norwood B. Or-

rick and Luke Marbury on the brief) and by The Maryland Council of Retail Merchants, Inc. (Frank, Bernstein, Conaway, Gump & Kaufman, Lawrence F. Rodowsky and Frank A. Kaufman on the brief.)

HAMMOND, J., delivered the majority opinion of the Court. HORNEY, J., dissents. Dissenting opinion at p. 500, *infra*.

The appellant, Falcone, bought a used tractor truck from the appellee, Palmer Ford, Inc., in August 1960. Falcone was either unable or unwilling to pay cash so the sale was on time with deferred monthly payments over a period of three years which were secured by a conditional sales contract which fully met the requirements and specifications of the Retail Installment Sales Law, codified both in Code (1957) and Code (1965 Replacement Vol.), as Art. 83, §§ 128 to 153. The final cash price of the vehicle, after deduction of the cash down payment and the trade-in allowance for an old truck, was $6,742.31. To this was added insurance premiums paid by the seller (as permitted by §§ 129 (6), 131 and 132 of Art. 83) in the amount of $248.75, making "the principal amount financed" $6,991.06. Sec. 132 (a) provides that "the time balance" in an installment sale of a motor vehicle "may include a finance charge and charges for insurance premiums, subject to the provisions of this section." Sec. 132 (b) specifies that:

> "The finance charge imposed on the sale of a motor vehicle shall not exceed the following rates:
>
> Class 1. Any new motor vehicle—$9 per $100 per year on the principal balance.
>
> Class 2. Any used motor vehicle designated by the manufacturer by a year model not more than two years prior to the year in which the sale is made— $12 per $100 per year on the principal balance.
>
> Class 3. Any used motor vehicle designated by the manufacturer by a year model more than two years prior to the year in which the sale is made—$15 per $100 per year on the principal balance."

The tractor truck which Falcone bought was in Class 2, which would have permitted a finance charge of "$12 per $100

per year on the principal balance"; however, Palmer Ford charged $7 per $100 per year—21% of the principal balance of $6,991.06, stated to be a finance charge of $1,468.22—because this was the then current rate set by the various financial institutions which bought its conditional sales contracts for large used trucks. The principal balance and the finance charge together amounted to a total "time balance" of $8,459.28, which was stated in the conditional sales contract executed by seller and buyer to be payable in "consecutive monthly installments * * * as follows: 36 @ $234.98" (which would total $8,459.28). The conditional sales contract was assigned by Palmer Ford to The Commerce Investment Company and Falcone duly and punctually made to it thirty-six monthly payments of $234.98, and then sued Palmer Ford for refund of the finance charges of $1,468.22, claiming that it had charged, and Commerce Investment had collected, "more of a finance charge than is allowed by law" and that he had "a right under the remedy provided in Article 83, Section 132, to a forfeit of all finance charges paid or $1,468.22." (Sec. 132 (d) provides that:

> "If any seller or holder of the installment sales agreement for a motor vehicle shall collect a finance charge on a motor vehicle greater in amount than the maximum specified in this section, or a service charge, the seller shall forfeit to the buyer all finance charges paid or payable under said agreement unless the overcharge results from a bona fide error in computation which is corrected within sixty days from the date of the installment agreement.")

The basis of Falcone's claim of an overcharge is that § 132 (b) of Art. 83, correctly read, means that the maximum finance charge—which he considers and refers to as "interest," although the statute does not—is to be figured on a declining principal balance so that as each monthly payment is made, interest then due is deducted and credited, and what remains of the monthly installment is applied to principal and a new principal balance thus arrived at.

Palmer Ford's theory is, first, that the statute contemplates and authorizes installment payments which will aggregate and

fully pay the "time balance owed by the buyer to the seller" (§ 129 (10)) which is the sum of (a) the "principal balance" (§ 129 (8)), and (b) the finance charge within the limits set by § 132 (b) stated as a sum in dollars, (the principal balance, being in turn the sum of (a) the unpaid cash balance owed by the buyer to the seller, (b) the cost of insurance provided by the seller, and (c) official fees to be paid by the seller to public officials for recording the papers securing the buyer's obligation) and, second, complementarily, that the "declining balance" technique has no place in installment sales regulated by the Retail Installment Sales Law.

Palmer Ford offered testimony which Judge Shure permitted the jury to receive, over Falcone's objection, that it was the custom in Maryland and nationally to treat the "principal balance" as the sum of the unpaid balance of the cash price, the cost of insurance, and official fees, and the custom in Maryland to compute the finance charge by multiplying the number of years over which the repaying installments are to stretch by the agreed rate so that where, as here, the time was three years and the rate $7 per $100 per year the finance charge customarily would be 21% of the principal balance.

At the close of the testimony offered on behalf of Falcone, Palmer Ford moved for a directed verdict which was refused, and then renewed its motion after all the testimony was in. This motion too was denied, as was Falcone's motion for a directed verdict in his favor made at the close of Palmer Ford's case.

Judge Shure submitted the interpretation of the retail installment sales statutes to the jury and furnished them with photostatic copies of §§ 129, 132 and 152 (the definition section) of Art. 83 for use in their deliberations. The jury returned a verdict for Palmer Ford and Judge Shure overruled Falcone's motion for judgment N.O.V. and entered a judgment for Palmer Ford.

The parties agree that Judge Shure erred in submitting the meaning of the statutes to the jury and Falcone contends that it was improper and erroneous to permit evidence of custom or practical construction. It is established beyond doubt that the construction and interpretation of statutes is for the court

and not the jury to decide. *Aravanis v. Eisenberg,* 237 Md. 242, 259; *Bethlehem Steel Co. v. Munday,* 212 Md. 214, 220; *Emery v. F. P. Asher, Jr., & Sons, Inc.,* 196 Md. 1; *Vogelsang v. Sehlhorst,* 194 Md. 413; *Belt v. Marriott,* 9 Gill 331. It is similarly established that it is necessary and proper to construe a statute only when and where the statute is ambiguous and of doubtful meaning, *Height v. State,* 225 Md. 251; *Pressman v. Barnes,* 209 Md. 544, 558, and that it is only when and where construction is necessary that resort should be had to evidence of contemporaneous or practical construction or custom or usage. *Armco Steel v. State Tax Comm.,* 221 Md. 33; *Bouse v. Hutzler,* 180 Md. 682; *Balto. County v. White,* 235 Md. 212; 82 C.J.S. *Statutes* § 357 (1953).

We find the provisions of the Retail Installment Sales Law here applicable and pertinent to be plain and unambiguous and their meaning clearly to be perceived from a reading of the words used by the Legislature. Therefore, although the court erred in not itself construing the statutes and in allowing evidence of practical construction and usage relative to them to be offered, the errors were not prejudicial because the court should have directed a verdict for Palmer Ford as a matter of law.

Falcone's basic argument falls into two parts. First, he contends that unless the court construes the rates specified in § 132 of Art. 83 to mean rates of interest which are subject to the declining balance technique—that is, unless the phrase "$12 per $100 per year on the princpial balance" used in § 132 be read as meaning "$12 per $100 per year on the unpaid principal balance"—Ch. 80 of the Laws of 1954 which added then § 119A—now § 132—to Art. 83 of the Code under the subtitle "Retail Installment Sales" to fix "the maximum rates which may be charged in retail instalment sales of motor vehicles, * * * and also providing penalties for overcharges" would be unconstitutional because there would be a variance between the title and the body of the Act. He reaches this conclusion on the premise that the word "rates" in the title must have the meaning and only the meaning of "rates of interest." The word rate has numerous and varied meanings apart from that of a measure of interest, as for example, hotel rates, the

rates of a publisher for stories, and as a measure of price as at the rate of so much a ton or a yard. More pertinently and conclusively, the word rates in the title of Ch. 80 of the Laws of 1954 would seem obviously to refer to the schedule of Class 1, Class 2 and Class 3 motor vehicles set forth in § 132 (b). Preceding the specifications of classes, subsection b commences with these words: "The finance charge imposed on the sale of a motor vehicle shall not exceed the following *rates*." (Emphasis supplied.) There is no substance to Falcone's contention as to the invalidity of the title of Ch. 80 of the Laws of 1954.

Falcone supports the second thrust of his basic argument—that the phrase "principal balance" in § 132 of Art. 83 should be read to mean a declining principal sum, the then unpaid principal balance—by saying that (1) the general rule is that as much as is necessary of each periodic partial payment on account of an indebtedness is first to be applied to pay the interest then due on the indebtedness and the balance then is to be applied to reduce the principal amount of the indebtedness; (2) if the declining balance requirement is not read into the Retail Installment Sales statutes any seller could, under the maximum finance charge allowed by law, make "nearly double the return on its money as compared with charging interest [presumably at the maximum of $12 per $100 per year permitted] on the unpaid balance or almost 24 percent," which Falcone says "is immoral," because "in Maryland, the general interest rate is 6 percent. Article 49, Section 1, of the Maryland Code, 1957." [1]

---

1. Falcone acknowledges there are many legislative exceptions to the basic allowed 6% rate of interest such as the 36% allowed by the Uniform Small Loan Law, Code (1964 Replacement Vol.), Art. 58A, § 16; the 6% "or one-half per cent ($\frac{1}{2}\%$) per month," plus "service charges in advance, for services rendered or to be rendered, and expenses * * * of four dollars ($4.00) or one twenty-fifth (1/25) of the original principal amount of the loan or advance, whichever is greater, on any loan or advance not in excess in original principal amount of five hundred dollars ($500.00); twenty dollars ($20.00) or one-fiftieth (1/50) of the original principal amount of any loan or advance whichever is greater, the original principal amount of which is in excess of five hundred dollars ($500.00)," and the specified delinquent charges, on loans over $300 and up to $1,500 under the Maryland

496

The answers to Falcone's contentions are, first, that an actual installment sale, at a price which is both greater than the cash price and in excess of the legal rate of interest on the cash price, is not subject to the usury laws because it is not a loan of money but a sale and, second, that the Legislature clearly gave recognition to this established rule by passing the Retail Installment Sales Law, with specified appropriate safeguards.

In *Beete v. Bidgood,* 7 B. & C. 453, 108 Eng. Rep. 792, where an estate, the cash value of which was sixteen thousand pounds, was sold for twenty thousand eight hundred pounds payable in stated installments (the added four thousand eight hundred pounds would have made the transaction usurious if it had been a loan of money), it was held in 1827 that the case arose "out of a contract for the sale of an estate, and not for the loan of money. * * * [And] in that there was no illegality."

The Supreme Court adopted the same view in 1861 in *Hogg v. Ruffner,* 66 U. S. (1 Black) 115, 17 L. Ed. 38, noting that to constitute usury there must either be a loan and the taking of usurious interest or the taking of more than legal interest for the forbearance of a debt or sum of money due, and holding:

"But it is manifest that if A propose to sell to B a tract of land for $10,000 in cash, or for $20,000 payable in ten annual instalments, and if B prefers to pay the larger sum to gain time, the contract cannot be called usurious. A vendor may prefer $100 in hand to double the sum in expectancy, and a purchaser may prefer the greater price with the longer credit; and one who will not distinguish between things that differ, may say, with apparent truth, that B pays a hundred per cent. for forbearance, and may assert that such a contract is usurious; but whatever truth there may be in the premises, the conclusion is manifestly

Industrial Finance Law (Code (1957), Art. 11, §§ 163-205, particularly § 196); the one per cent per month interest allowed to credit unions on their loans to members under Code (1957), Art. 11, § 153; and the 4% extra allowed Development Credit Corporations under Code (1965 Supp.), Art. 23, § 428, but says these extra allowances do no more than establish a general legislative intent or pattern that the maximum rate of interest is 12%.

erroneous. Such a contract has none of the characteristics of usury; it is not for the loan of money, or forbearance of a debt."

Our predecessors took the same view. *Williams v. Reynolds,* 10 Md. 57, held that for there to be usury there must be a loan of money and that the sale of a valid promissory note at a discount was not usurious because there was an actual sale and not a loan. *Bailey v. Poe,* 142 Md. 57, took the same view.

Almost all states recognize and apply this rule. See the discussion in *Judicial and Legislative Treatment of "Usurious" Credit Sales,* 71 Harv. L. Rev. 1143 (1958), and *Usury-Applicability of State Usury Laws to Installment Sales,* 62 Mich. L. Rev. 1268 (1964) ; and see 6A Corbin, Contracts § 1500. Some typical relatively recent cases which are illustrative are: *Lincoln Loan Service, Inc. v. Motor Credit Co., Inc.* (Mun. Ct. App. D. C.), 83 A. 2d 230; *Luchesi v. Capitol Loan & Finance Co.* (R. I.), 113 A. 2d 725; *Steffenauer v. Mytelka & Rose, Inc.* (N. J. Super.), 210 A. 2d 88; *Carolina Industrial Bank v. Merrimon* (N. C.), 132 S. E. 2d 692; *Uni-Serv Corp. of Mass. v. Commissioner of Banks* (Mass.), 207 N. E. 2d 906.

As retail installment sales grew in number throughout the country, courts increasingly took sharper looks at such transactions to make sure that there was a sale in substance and actually rather than a sale in form only which masked a loan of money or forbearance of a debt, and more state legislatures enacted statutes governing retail installment sales which, although recognizing that such sales were not loans subject to the usury laws, limited the amount by which the time price could exceed the cash price and imposed other desirable safeguards for the protection of buyers. See 71 Harv. L. Rev. 1143 and 62 Mich. L. Rev. 1268, both referred to above.

Maryland enacted its Retail Installment Sales Act in 1941 by Ch. 851 of the Laws of that year and added the provisions as to motor vehicles, as we have heretofore noted, by Ch. 80 of the Laws of 1954. Ch. 80 provided that "except as herein specifically provided in this section [132], the provisions of the 'Retail Installment Sales Law' shall remain unaffected."

A review of the various pertinent provisions of the Mary-

land Retail Installment Sales Law discloses clearly that it contemplates and authorizes just what occurred in the case at bar. Sec. 128 of Art. 83 requires every installment sales agreement to be evidenced by a writing executed by both parties and containing "all of the agreements" of the parties. Sec. 129 specifies what such an agreement shall contain and spell out, including (1) the cash price of the goods; (2) any charges for delivery, installation, repair or other services separately stated, if there is such charge; (3) the sum of items (1) and (2); (4) the amount of the down payment; (5) the unpaid balance of the cash price payable by buyer to seller "which is item (1) or item (3), as the case may be, less item (4)"; (6) the cost to the buyer of insurance for which credit is extended him; (7) the amount of official fees, for which the buyer is charged, for recording the written agreement; (8) "the principal balance owed" which is the sum of items (5), (6) and (7); (9) "the finance charge" stated as a sum in dollars; (10) the "time balance" owed by the buyer to the seller, which is the sum of items (8) and (9), and the number of installment payments required to pay it, and the amount and time of each payment.

Sec. 152 contains definitions of terms used. Subsection (j) defines "cash price" to mean the minimum price for which the article may be purchased for cash from the seller by the buyer. "Principal balance" is defined in subsection (1) to be "the amount to be entered as item (8) pursuant to subsection (a) of § 129." "Finance charge" is (subsection (m)) "the amount in excess of the cash price of the goods sold, agreed upon by the seller and the buyer, *to be paid by the buyer* for the privilege of purchasing goods under the installment sale agreement." (Emphasis supplied.) "Time balance" says subsection (n) "means the amount to be entered as item (10) pursuant to subsection (a) of § 129."

Sections 128, 129, 132 and 152 read together completely deflate Falcone's arguments. The parties signed the writing required by § 128 in full and proper form. In it Falcone agreed to buy the tractor truck and to have title remain with Palmer Ford until it was paid for. Falcone further agreed, as § 129 contemplates and provides, that he owed a principal balance of $6,991.06 (and also agreed as to the amount and character of

the various permitted items which together made up the principal balance) and that he owed a finance charge (which by definition was "the amount in excess of the cash price * * * agreed upon by the seller and the buyer, *to be paid by the buyer* for the privilege of purchasing the goods under the installment sale agreement" (emphasis supplied)) of $1,468.22. Having agreed, as the statute provides in items (8) and (9), that he owed a cash balance of $6,991.06 and a finance charge of $1,468.22, Falcone next agreed by item (10) in so many words, as the statutes provide, that he owed the sum of items (8) and (9) as a "time balance" and that he would pay that time balance of $8,459.28, the sum of items (8) and (9) in thirty-six equal installments of $234.98 each. The law specifies in §§ 128 and 129 (a) (10) that the buyer must agree to pay the time balance—no more, no less—the most pertinent language being that of item (10) of § 129 (a), when it says that the installment sale agreement shall set out the buyer's agreement as to the amount of the time balance and "the number of installment payments [with amount and time of payment] required to pay *it* [the time balance]." It is the precise amount of the time balance the act contemplates is to be paid and it is that precise amount that the buyer must agree to pay.

Confirmation of legislative intent—that the principal balance is a constant and not a declining amount—is furnished by § 138 of Art. 83 which gives the buyer the right to prepay all or any part of "the unpaid time balance" in full before maturity, and provides that the seller must refund to him "a portion of the finance charge" which is to be at least as great a proportion of the "total finance charge" as the proportion of the total of the periodic payments scheduled after the time of prepayment bear to the total original time balance or, alternatively, the amount of the total finance charge figured per month under the number of months scheduled in the agreement multiplied by the number of months "by which the payment of the time balance has been anticipated by the buyer." The refund set up by § 138 is not based on or related to the principal balance (or unpaid principal balance) but on the "unpaid time balance," and the refund contemplated is a finance charge no part of which goes to the reduction of the principal balance at any

500

time. All this not only gives no hint that the Legislature regarded that there would be a declining principal balance but definitely suggests the contrary.

It is to be noted also that the Legislature has, in another situation, shown by appropriate language a recognition of the difference between a constant principal balance and an unpaid principal balance (a declining balance). The Land Installment Contracts Act, Code (1957), Art. 21, § 110, *et seq.,* is an act very similar to the Retail Installment Sales in its requirements of setting out specified items in a certain order and manner and its definition of the final figure as the "principal balance." Sec. 112 of Art. 21 sets a maximum rate of interest but unlike § 132 (b) of Art. 83 provides that the interest on "the unpaid balance" shall not exceed 6% per annum, and immediately thereafter directs an application of the installment payments in the way Falcone argues retail installment sale payments should be applied to create a declining balance.

We have been referred to and have found but one pertinent case decided under a law similar to the Maryland Retail Installment Sales Law. The Minnesota Supreme Court decided in *Van Asperen v. Darling Olds, Inc.,* 93 N. W. 2d 690, that their Act did not require computation of the Minnesota "time price differential" (the Maryland "finance charge") to be computed on a declining principal balance.

We find that judgment was correctly entered for Palmer Ford.

*Judgment affimed, with costs.*

HORNEY, J., filed the following dissenting opinion.

I agree with the majority in all respects except as to the manner in which the "finance charge" on the "principal amount financed" was calculated. Instead of the seller making a finance charge of 21% for three years on the whole principal amount financed of $6991.06, or a charge of $1468.22, I think the finance charge should have been figured at the rate of $7 (the agreed charge instead of $12 permitted by law) on $6991.06 for one year, on $4660.70 for one year and on $2330.36 for one year for this reason: Since the word "per" as used in

§ 132(b) of Article 83 ($9, $12 or $15 "per $100 per year on the principal balance") literally means "for each," I believe it was the intention of the legislature that the authorized rate on each class of a financed motor vehicle was to be figured annually on the "principal balance" due as of the beginning of each year the contract was to continue. Calculated in this manner, the finance charge on the principal amount financed of $6991.06 would have been $978.75 ($489.37 on $6991.06 for the first year, $326.25 on $4660.70 for the second year and $163.-13 on $2330.36 for the third year), which, when added to the principal amount financed would have amounted to $7969.81 as the "total time balance" payable in thirty-six equal monthly installments of $221.39 each.

I would reverse.