732 A.2d 887

# UNITED CABLE TELEVISION OF BALTIMORE LIMITED PARTNERSHIP

v.

## Louis BURCH et al.

### No. 82, Sept. Term, 1998.

Court of Appeals of Maryland.

July 26, 1999.

Robert E. Youle (Brian G. Eberle, Williams, Youle & Koenigs, P.C., Denver, CO; David P. King, Hogan & Hartson, L.L.P., Baltimore), on brief, for appellant.

Philip S. Friedman (Ifshin & Friedman, P.L.L.C., Washington, DC; Francis J. Gorman, P.C., Charles L. Simmons, Jr., Gorman & Williams, Baltimore), on brief, for appellees.

Patricia Sturdevant, Counsel for Nat. Ass'n of Consumer Advocates, Washington, DC, Michael Tankersley, Counsel for Public Citizen Litigation Group, Washington, DC, Deborah Zuckerman, Sarah Lenz Lock, AARP Foundation Litigation, Washington, DC, for amicus curiae American Ass'n of Retired Persons.

Alan Rifkin, Rifkin, Livingston, Levitan & Silver, Baltimore, for amicus curiae Nat. Cable Television Ass'n, Cable Telecommunications Ass'n of Maryland, Delaware and the District of Columbia, Nat. Vehicle Leasing Ass'n, Nat. Multi Housing Authority, Nat. Apartment Ass'n, American Seniors Housing Ass'n, Maryland Retailers Ass'n, Intern. Furniture Rental Ass'n and Self-Storage Ass'n.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

## ORDER

The Court having considered the two motions for reconsideration and the four motions for leave to file *amicus curiae* memoranda or briefs, it is this 26 th day of July, 1999,

ORDERED, by the Court of Appeals of Maryland, that the motion for reconsideration filed by the appellees, Louis Burch, et al., be, and it is hereby, granted, and, it is further

ORDERED that the opinion of the Court filed on June 8, 1999 be, and it is hereby, withdrawn, and the opinion filed with the date of this Order is substituted in lieu of the opinion filed on June 8, 1999, and, it is further

ORDERED that the motion for reconsideration filed by the appellant, United Cable Television of Baltimore Ltd. Partnership, be, and it is hereby, denied, and, it is further

ORDERED, that the motions of *amici curiae* to file memoranda, the first filed collectively by National Vehicle Leasing Association; National Multi-Housing Council; National Apartment Association; American Seniors Housing Association; Maryland Retailers Association; International Furniture Rental Association; and Self-Storage Association, the second filed by the Maryland Chamber of Commerce, and the third filed by Telecommunications Association of Maryland, Delaware and the District of Columbia, be, and they are hereby, granted, and it is further

ORDERED, that the motion of *amicus curiae*, Maryland Bankers Association for leave to file a brief in support of Appellant's motion for reconsideration, with accompanying memorandum of law in support thereof, be, and it is hereby, denied.

/s/ ROBERT M. BELL
Chief Judge

RODOWSKY, Judge.

This class action is brought on behalf of consumer subscribers to the cable television service in Baltimore City. The action challenges the five dollar per month late fee that is charged subscribers. The Circuit Court for Baltimore City concluded that this late fee was a penalty and not an enforceable liquidated damages provision, because it unreasonably overestimated the supplier's costs resulting from late payment. We agree that the charge is a penalty, but we arrive at that conclusion because a subscriber's undertaking is a contract to pay money, damages for the breach of which are the principal balance due, with lawful interest.

The respondent, and defendant below, is United Cable Television of Baltimore Limited Partnership (United) which does business as TCI of Baltimore. United is a subsidiary of Telecommunications, Inc. (TCI), a Denver-based company, which owns and operates approximately forty cable franchises. TCI indirectly owns a majority interest in United. For the purpose of providing management support to its various local cable affiliates (cable systems), TCI is divided into geographi-

cal divisions. Each division is wholly owned by TCI. The management support provided to United and the other cable systems by the divisions includes legal, human resources, marketing, and accounting.

Approximately 112,000 residents of Baltimore are provided cable services by United. United offers its services on a month-to-month basis.

During the period with which we are concerned, namely, November 7, 1992, to the present, United offered a variety of channel service combinations and selections for which the respective monthly subscription prices varied at different times during the relevant period. The basic plan furnishes the fewest number of channels, and the circuit court used a figure of approximately twenty dollars as the subscription price for basic service.

When first instituted in June 1990, United's late fee was three dollars. The fee was increased to four dollars in February 1992, and it reached the present five dollar level in January 1993. Each time United increased its late fees, it notified customers of the changes by billing inserts.

In billing its customers, United operates on billing cycles which run somewhat in advance of the period of cable service that is being billed. Any given customer's billing cycle begins three days in advance of the approximately thirty day service period for which the bill is sent. Bills become due and payable six days after the commencement of the then current service period. The bills indicate that the late fee is assessed on the fifteenth day of the then current service period. There was testimony that, as a matter of general practice, United did not impose its late fee until a few days after the fifteenth day of the service period. The next succeeding billing cycle begins on the twenty-seventh day of the then current service period. In addition to the subscription price for the immediately forthcoming service period, a bill from United will include any balance carried forward from the prior billing cycle, any payments and credits, any late charge, and the new balance.

The contract between United and a subscriber is illustrated by a document entitled, "IMPORTANT NOTICES TO OUR CUSTOMERS," which reads:

"Charges for service start within 24 hours after service is installed. The charges for one month's service, any deposits, and any installation or equipment-lease fees, are payable when service is installed. After that, we will bill you each month in advance for service . . . . .

"The bills you receive will show the total amount due and the payment due date. You agree to pay us monthly by the payment due date for that service and for any other charges due us, including any administrative fees due to late payments or any returned check fees.

"If you do not pay your bill by the due date, you agree to pay us an administrative fee for late payment. The administrative fee is intended to be a reasonable advance estimate of our costs which result from customers' late payments and non-payments. . Other fees or charges may also be assessed by your local cable system.

"We do not anticipate that you will pay your bill late and the administrative fee is set in advance because it would be difficult to determine the costs associated with any one particular late payment. We do not extend credit to our customers and the administrative fee is not interest, a credit service charge or a finance charge."

The document further provides that customers are permitted to cancel their cable service at any time without penalty by giving notice.

Both the brochure and a rate card were provided to customers when they subscribed to United's cable services. Rate cards also were printed each month in United's program guide, which is sent to existing customers who order that service. Further, a statement of United's late fee policy was included in an annual customer mailing, and disclosures made on United's standard billing form apprised customers that late charges would be imposed for late payment.

If a customer does not pay a bill when due, United begins its collection process by including a statement in the late-payer's next bill that the account is delinquent and that service will be disconnected if payment is not received. Upon receiving this notification, customers frequently call United in an attempt to clear up their delinquent accounts. United is required to maintain a customer service department, in part, to field the calls that result from the late fee notices. If a customer's account remains delinquent, United programs an automatic dialing system, called the "automatic response unit," to place telephone calls to the customer's residence. At about the same time, United mails a written reminder notice to the late-paying customer. These efforts result in more calls to United's headquarters.

If an account remains delinquent after the phone calls and mailings, the company's employees perform a "soft" disconnection which prevents the late-paying customer from taking advantage of United's cable services and provides a message on the customer's screen to call United. This step generally leads to a third round of calls from customers who wish to reactivate their cable services. Subsequent to soft disconnection, the customer receives two final telephone calls from collection representatives employed by United. During the first call, the representative attempts to make payment arrangements with the customer. The second call warns the customer that hard disconnection is imminent and that the call is the customer's last opportunity to avoid that result.

If the customer's bill remains unpaid, a technician employed by United drives to the customer's residence to seek payment of the bill. If the customer refuses to pay the overdue bill, the technician permanently interrupts the customer's cable service. United employees continue to make telephone calls to the customers after hard disconnect in an attempt to obtain payment of the bills. If these are unsuccessful United at some point writes the account off as a bad debt and turns it over to an outside collection agency.

The complaint in the instant matter was filed in November 1995. The matter was tried for a period of three weeks in the spring and summer of 1997. The testimony of many witnesses was produced, and many exhibits were introduced. To a considerable degree the case was a battle of experts over quantifying the costs incurred by TCI when an account was not paid in full by the due date under the United-subscriber contract, and over which of those costs properly were to be included in computing a late charge. For example, after this action was instituted, United retained an accounting firm, Deloitte & Touche, to calculate the monthly cost of delinquencies per delinquent customer, and the author of that study concluded that the cost was $16.14. The Plaintiffs' expert opined that that cost was thirty-eight cents.

After analyzing all of this evidence the circuit court concluded that the fee for late payment should be no more than fifty cents per month. The court concluded that five dollars was not a reasonable estimate of the damages that would be incurred by United if a customer failed to pay in full by the due date. Hence, the five dollar late charge could not be sustained as a valid liquidated damages provision; rather, it was a penalty.

Accordingly, United was entitled only to its actual damages which, under the circuit court's analysis, was fifty cents per month. The court entered judgment against United for the "excessive" late fees collected by it from November 7, 1992, through September 20, 1997, in the amount of $6,701,503.60 and simple prejudgment interest calculated at six percent per annum in the amount of $897,015.11. Counsel fees were awarded on the theory that the efforts on behalf of the Plaintiffs had created a common fund. The court awarded counsel for the Plaintiffs one-third of the fund recovered in counsel fees and $85,615.60 in reimbursement for litigation expenses. The fees and litigation expenses were to be paid out of that fund.

The circuit court further ordered, effective after all appeals had been determined or exhausted, that notice be given by

mail and by newspaper advertisement to customers/subscribers advising those who had paid a late fee that they have six months within which to file a proof of claim for a pro rata share of the net common fund. The court then directed that the unclaimed remainder of the net common fund be divided into two equal shares, one of which is to be paid to the Baltimore City Mayor's Office of Cable and Communication and the other of which is to be paid to a charitable fund to be established per the court's order.

United appealed to the Court of Special Appeals, and this Court, on its own motion, issued the writ of certiorari.[1]

## I

The essence of United's position is that it is entitled to recover as damages "six categories of late payment costs: (1) local office handling, mailing, and notification; (2) cost of funds; (3) data processing and billing; (4) field collections; (5) in-house/outside collection; and (6) bad debt." Brief of Appellant at 14. Under United's theory, if United brought suit against a subscriber, after United's collection efforts had failed, United would have a right to produce proof as to each of the foregoing enumerated items of cost and, if that proof were accepted by the trier of fact, United would be entitled to a judgment for the principal balance due on the account plus damages reimbursing United for its additional costs. Inasmuch as proof of those costs is extremely difficult, particularly because United cannot predict when an account will go into default and how long it will remain delinquent, United asserts that it is entitled to make a reasonable estimate of its damages and include it in the contract as a liquidated sum or late charge which the subscriber agrees to pay. The short answer to United's contention is that it is not entitled to prove costs of collection as damages under a contract of the type at issue here.

---

1. The Plaintiffs' complaint alleged theories of liability other than the penalty versus liquidated damages theory. The Plaintiffs did not prevail in the circuit court on those other theories.

■ Under the contract, a subscriber promises to pay the account balance which is a specific amount appearing on the face of the bill and which is determined by the services rendered by United at agreed prices. A subscriber also promises to pay that amount by a specified date that also appears on the billing. Under Maryland law a United customer's promises are a contract to pay money. From this conclusion, two consequences flow that are relevant to this case. First, the measure of damages for the breach of a contract to pay money is the amount promised to be paid plus interest at the lawful rate from the due date to the date of judgment. Second, because this measure of damages is simply a matter of calculation, it may not be increased by a contractual liquidated damages provision requiring payment of a greater amount. The result is that the liquidated damages provision is a penalty.

## A

■ Prejudgment interest comes in two varieties, discretionary and of right. Both versions are "in the nature of an element of damages." *Maryland State Highway Admin. v. Kim,* 353 Md. 313, 327, 726 A.2d 238, 245 (1999). There we said that

> "those instances in which pre-judgment interest is allowed as a matter of course [are] because 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.'"

*Id.* at 326, 726 A.2d at 245 (quoting *First Virginia Bank v. Settles,* 322 Md. 555, 564, 588 A.2d 803, 807 (1991), in turn quoting *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.,* 311 Md. 36, 53–54, 532 A.2d 694, 702–03 (1987)).

■ The contract to pay money is a subset of the class of cases described in *Maryland State Highway Administration* in that, in the contract to pay money, it is known at contract

formation that "the obligation to pay and the amount due [would be] certain, definite, and liquidated by a specific date." As we said in *Crystal v. West & Callahan, Inc.*, 328 Md. 318, 614 A.2d 560 (1992), "[t]he ordinary rule in contract cases, if the contract requires payment of a sum certain on a date certain, is [that] prejudgment interest typically is allowed as a matter of right." *Id.* at 343, 614 A.2d at 572.

The rule has been applied in actions for past due rent, *see Eidelman v. Walker & Dunlop, Inc.*, 265 Md. 538, 545, 290 A.2d 780, 784 (1972) ("Interest is recoverable as of right upon a contract to pay money upon a day certain."); *Brown v. Bradshaw*, 245 Md. 524, 539, 226 A.2d 565, 573 (1967); *Dennison v. Lee*, 6 G. & J. 383, 386 (1833); *Newson's Adm'r v. Douglass*, 7 H. & J. 417, 453–54 (1826). The rule has also been recognized in *I.W. Berman Properties v. Porter Brothers, Inc.*, 276 Md. 1, 18, 344 A.2d 65, 76–77 (1975); *Atlantic States Constr. Co. v. Drummond & Co.*, 251 Md. 77, 85, 246 A.2d 251, 255 (1968); and *Affiliated Distillers Brands Corp. v. R.W.L. Wine & Liquor Co.*, 213 Md. 509, 516, 132 A.2d 582, 586 (1957).

Of significance here is that "[w]here the contract or obligation is for the payment of a definite sum of money[,] *the measure of damages* is the amount of money promised to be paid, with legal interest, the allowance of interest being [a] matter of legal right." 1 J.P. Poe, *Pleading and Practice in the Courts of Law in Maryland* § 584C, at 608 (5th Tiffany ed. 1925) (Poe) (emphasis added). W.T. Brantly, *Law of Contract* § 165 (2d ed. 1922) (Brantly), is in accord, saying: "Legal interest on the money is the measure of damages for the breach of a contract to pay a sum at a certain time." *Id.* at 368 (footnote omitted). *See also Winder v. Diffenderffer*, 2 Bland 166, 204 (1829) ("Legal interest is the measure of damages which the law allows in all cases for the detention of money; which the holder is made to pay where he is in any default in not paying, or applying the money in his hands as he was bound to do.").

*Brown v. Hardcastle*, 63 Md. 484 (1885), applies the rule. There, the issue was whether mortgaged property was chargeable with six percent interest after default where the mortgage recited that it carried one percent interest to the due date. This Court held as follows:

> "[T]he weight of best authorities is, we think, decidedly in favor of making interest on overdue instruments to run at the legal rate, after due and unpaid. In this instance there was a bond given in double the penalty of the debt, conditioned for the payment of the debt by a particular day. Upon a suit at law on that penal bond the measure of damages would be the exact loss the plaintiff had sustained; and inasmuch as the debtor had agreed to pay by a particular day, and the creditor, upon that condition, had let him off with only one per cent. interest, . . . the true measure of damages would be the debt with legal interest thereon after default. The agreement is not to pay one per cent. interest until paid, but to pay the sum named by a particular day, with one per cent. interest added."

*Id.* at 491.

The rule is also illustrated in *Loudon v. Taxing Dist. of Shelby County*, 104 U.S. 771, 26 L.Ed. 923 (1881). There a paving contractor had been paid in bonds by the taxing district, but the issuer did not pay the principal amount of the bonds in full at maturity. The contractor sought the loss suffered in the sale of the bonds at a discount and the increased interest that the contractor had been required to pay for interim borrowings. This relief was denied. The court said that "all damages for delay in the payment of money owing upon contract are provided for in the allowance of interest, which is in the nature of damages for withholding money that is due. The law assumes that interest is the measure of all such damages." *Id.* at 774, 26 L.Ed. at 924.

The foregoing is the common law rule. *See Orr v. Churchill*, 1 H. Black. 227, 232, 126 E.R. 131, 134–35 (1789) ("[W]here the question is concerning the non-payment of money in circumstances like the present [action of debt on bond], the

law having by positive rules fixed the rate of interest, has bounded the measure of damages; otherwise the law might be eluded by the parties."). *See also Fellows v. National Can Co.,* 257 F. 970, 972 (6th Cir.), *cert. denied,* 250 U.S. 662, 40 S.Ct. 11, 63 L.Ed. 1195 (1919); *United Shoe Machinery Co. v. Abbott,* 158 F. 762, 763 (8th Cir.1908); *Knight v. Marks,* 183 Cal. 354, 357, 191 P. 531, 532 (1920); *Maybury v. Spinney–Maybury Co.,* 122 Me. 422, 434, 120 A. 611, 616 (1923); *Mead v. Wheeler,* 13 N.H. 351, 353–54 (1843); *Semico, Inc. v. Pipefitters Local No. 195,* 538 S.W.2d 273, 275 (Tex.Civ.App. 1976).

Contemporary treatises recognize the rule. *See* 5 A.L. Corbin, *Corbin on Contracts* § 1065, at 373–74 (1964) (Corbin) ("In general, the damages collectible for failure to pay a sum of money are limited to interest at the legal rate, if one exists, or at market rates."); 5 S. Williston & W. Jaeger, *A Treatise on the Law of Contracts* § 784, at 732 (3d ed. 1961) (Williston & Jaeger) ("[T]he doctrine of the common law [was] that when A promised to pay B a sum of money on a certain day and did not do so, B could only recover the sum with, in certain cases, interest, but could never recover further damages for non-timeous payment[.]").

Restatement (Second) of Contracts § 354 (1981) presents the following simple illustration:

"A contracts to sell B goods for $10,000 on 30 days credit, nothing being said as to interest. A delivers the goods but B fails to pay for them at the end of 30 days. A sues B and recovers $10,000. A is also entitled to simple interest on the $10,000 at the legal rate from the expiration of the credit period."

*Id.* at 152, Illustration 2.

The rule that lawful interest limits the damages for breach of a contract to pay money is recognized by other commentators, both English and American. *See* J.P. Benjamin, *A Treatise on the Law of Sale of Personal Property* 829 (8th ed. 1950) (Benjamin); G. Field, *Treatise on the Law of Damages* § 153 (1876) (Field); W.B. Hale, *Handbook on the Law of*

*Damages* § 60, at 220 (2d ed. 1912) (Hale); 2 J.A. Joyce & H.C. Joyce, *A Treatise on Damages* § 1308, at 1450 (1903) (Joyce); C.T. McCormick, *Handbook on the Law of Damages* § 54, at 213 (1935) (McCormick); 2 T. Sedgwick, *A Treatise on the Measure of Damages* § 622b, at 1217 (9th ed. 1920) (Sedgwick); J.G. Sutherland, *A Treatise on the Law of Damages* § 311, at 970–71 (4th ed. 1916) (Sutherland).

■ The rule discussed above impacts one of the rules governing the allowance of liquidated damages. "[W]here a *greater sum* is to be paid upon the failure to pay *a less* ... the sum to be paid by the party in default will be considered *as a penalty.*" *Geiger v. Western Maryland R.R. Co.*, 41 Md. 4, 15 (1874).[2] *See also Hough v. Kugler*, 36 Md. 186, 195–96 (1872); Williston & Jaeger at 732.

The evolution of and rationale for the rule is presented in *Williams v. Green*, 14 Ark. 315 (1854). Anciently, at the common law, contracts were drawn to include a penal sum payable on breach of the obligor's promise to perform. *Id.* at 317. To obviate the hardship of literal enforcement of the penal sum equity decreed "that the judgment for the penal sum should stand as a security for the payment by the obligor of such damages as the obligee had actually sustained, of which an account would be taken." *Id.* at 317–18. By 8 and 9 Wm. III ch. 11 (1697), 2 Alexander's British Statutes at 828 (Coe ed.1912), courts of law were authorized to administer the same relief as did equity. Thereafter, "a new reform of contract was resorted to, whereby the parties anticipated and agreed in advance, for a certain amount of damages which would be accepted as a full compensation for such injury as might be sustained by a breach of the contract." *Williams*, 14 Ark. at 319. Against the foregoing background the *Williams* court said:

---

**2.** *Geiger* did not involve a contract for the payment of money. It dealt with a provision in a contract for the construction of a railroad under which the contractor would pay to the owner the retainage on work done, if the owner's supervising engineer declared a default on the part of the contractor.

"But contracts for stipulated damages are narrowly watched, because of the facility they may afford of being used as a cover for penalties in disguise. One of the inflexible rules of law on this subject is, that whenever the sum agreed to be paid, though expressed as stipulated damages, is in lieu of the non-payment of a lesser sum, certain or capable of being ascertained from the terms of the contract, it is construed to be a penalty. Besides violating the usury laws, such a contract could not be enforced, as stipulated damages, because it would become a mere subterfuge and evasion of the equitable doctrine of relieving against bonds with a penalty, conditioned for the payment of money.... Though the creditor, where a high standard of commercial integrity prevails, may be ruined by his debtor's want of punctuality, the law has fixed a certain rate of interest as a compensation for the use of money. This principle distinctly stated in *Orr vs. Churchil,* 1 *Hen. Black.,* pervades all the cases."

*Id.* at 319–20.

The relationship between damages for breach of a contract to pay money and an unenforceable penalty is well explained in Sutherland, where the author states:

"It is true, one of the test rules for distinguishing a penalty from liquidated damages is that if a larger sum is agreed to be paid for default in paying a smaller the larger is a penalty. A note made payable for a sum certain on a specified day, without interest if punctually paid, otherwise, with interest from date, comes within the letter of the rule. If the letter controlled, the stipulation for interest would be held to be a penalty. The rule, however, does not apply to such a case. It is designed to prevent agreements to pay a large sum in consequence of default in paying a small one, which is the actual debt, because interest is the established measure of damages for such default. It does not apply to invalidate any legal rate promised on the event of a default.

"No damages for the mere non-payment of money can ever be so liquidated between the parties as to evade the provisions of the law which fixes the rate of interest. In all

such cases the law, having fixed the rate by positive rules, has bounded the measure of damages. This is the rule, the other the corollary; because interest is the measure of damages for breach of contract to pay money the law will treat as a penalty any larger sum which a debtor may agree to pay for such a default. But within the bounds of the legal rate of interest parties may liquidate damages for not paying money when it is due."

*Id.* at 970–71 (footnotes omitted). The same author reiterates the same concept in § 318, at 858, as follows:

"No agreement is valid for a greater rate of interest to be paid after maturity than may be legally stipulated to be paid before. This rule is founded upon principle and authority. Parties may contract absolutely or conditionally, as we have seen, for any rate within a statute fixing interest limits. When a rate above those limits is agreed to be paid before maturity it is usurious; not collectible; if it is agreed to be paid after maturity it is in the nature of a penalty and has no effect; then the legal rate will govern as though no agreement had been made."

Accordingly, provisions for payment of greater than legal interest after the due date on breach of a contract to pay money have been held void as a penalty in *Fellows,* 257 F. at 972; *Knight,* 191 P. at 532; *Semico,* 538 S.W.2d at 275; and *Clark, Austin & Smith v. Kay,* 26 Ga. 403, 406 (1858). Corbin flatly states that "[o]ne case in which the courts all agree that the amount is a penalty and unenforceable is where a sum of money is made payable upon default in the payment of a smaller sum of money, and the difference between the two sums is not merely the interest value of the smaller." Corbin § 1065, at 373 (footnote omitted). *See also* Hale § 60, at 220; Joyce § 1308, at 1449; McCormick § 146, at 604.

■ Further, one of the elements of a valid liquidated damages provision is that the anticipated damages be " 'in their nature uncertain and incapable of exact ascertainment.' " *Anne Arundel County v. Norair Eng'g Corp.,* 275 Md. 480, 492, 341 A.2d 287, 293 (1975) (quoting *Baltimore Bridge Co. v.*

*United Rys. & Elec. Co.*, 125 Md. 208, 214, 93 A. 420, 422 (1915)).  Here, under the rule which makes interest at the highest lawful rate the measure of damages for breach of a contract to pay money, the anticipated damages are not uncertain and incapable of exact ascertainment.  *Cf. H.J. McGrath Co. v. Wisner*, 189 Md. 260, 55 A.2d 793 (1947) (holding that liquidated damage provision for failure to deliver tomatoes was a penalty where, under the circumstances of the era, there was a ready market for ascertaining the cost of substitute tomatoes).

### B

As we shall demonstrate below, there is no statute in Maryland, applicable to United's accounts with its subscribers, that alters the common law rule described above.  Further, Maryland Constitution, Article III, § 57 states: "The legal Rate of Interest shall be *Six per cent. per annum;* unless otherwise provided by the General Assembly."  Thus, that constitutional provision sets the legal rate of interest.  *See Crystal*, 328 Md. at 342, 614 A.2d at 572; *Maryland Nat'l Bank v. Cummins*, 322 Md. 570, 599–600, 588 A.2d 1205, 1219 (1991).  It is that rate by which United's liquidated damages provision must be measured.

There are Maryland statutes that, in various ways, acknowledge the imposition of late charges.  These statutes are found in Maryland Code (1975, 1990 Repl.Vol., 1998 Cum.Supp.), Title 12, "Credit Regulations," of the Commercial Law Article (CL) and in Maryland Code (1974, 1996 Repl.Vol., 1998 Cum. Supp.), Real Property Article (RP).  In order to present a very general overview of these statutes, we shall divide them into four classes.

Class I statutes regulate the amount and timing of a late charge.  Comprising this class are CL § 12–405(c), applicable to secondary mortgage loans;[3] CL § 12–623, applicable to

---

**3.**  CL § 12–405(c) reads:

retail installment sales;[4] and RP § 11–110(d) and (e), part of the Maryland Condominium Act.[5]

What we label as a Class II statute regulates the amount and timing of late charges and, in addition, expressly provides

---

*"Delinquent charges.*—(1) A lender may collect from the borrower a **delinquent or late charge** of the greater of $2 or 5 percent of the amount of any delinquent or late periodic installment, if:

(i) The delinquency has continued for at least 10 days; and

(ii) A delinquent or late charge has not already been charged for the same delinquency. . . ."

4. CL § 12–623 reads:

"(a) *Delinquency charge.*—If an agreement on which the finance charge is computed in advance so provides, the holder of the agreement may collect a **delinquency or collection charge** of the lesser of $10 or 5 percent of the amount of any payment in default, if the default has continued for at least 10 days.

(b) *Attorney's fees and court costs.*—(1) In addition to the **delinquency or collection charge**, the agreement may provide for the payment of:

(i) Attorney's fees not exceeding 15 percent of the amount due and payable under the agreement; and

(ii) Court costs.

(2) Attorney's fees may be collected only if the agreement is referred for collection to an attorney who is not a salaried employee of the holder."

5. RP § 11–110(d) and (e) reads:

"(d) *Imposition of lien.* Payment of assessments, together with **interest, late charges,** if any, costs of collection and reasonable attorney's fees may be enforced by the imposition of a lien on a unit in accordance with the provisions of the Maryland Contract Lien Act. Suit for any deficiency following foreclosure may be maintained in the same proceeding, and suit to recover any money judgment for unpaid assessments may also be maintained in the same proceeding, without waiving the right to seek to impose a lien under the Maryland Contract Lien Act.

(e) *Interest on unpaid assessment; late charges; demand for payment of remaining annual assessment.*—(1) Any assessment, or installment thereof, not paid when due **shall bear interest,** at the option of the council of unit owners, from the date when due until paid at the rate provided in the bylaws, not exceeding 18 percent per annum, and if no rate is provided, then at 18 percent per annum.

(2) The bylaws **also may provide for a late charge** of $15 or one tenth of the total amount of any delinquent assessment or installment, whichever is greater, provided the charge may not be imposed more than once for the same delinquent payment and may only be imposed if the delinquency has continued for at least 15 calendar days. . . ."

that those charges are not interest. This class consists of CL § 12–105, applicable to loans made under Subtitle 1 of Title 12.[6]

Class III statutes authorize late charges without fixing any maximum late charge. Further, these statutes expressly state that any late charge permitted by the statute is neither interest nor a finance charge. The statutes in Class III are CL § 12–910, applicable to open end credit,[7] and CL § 12–1008, applicable to closed end credit.[8]

---

6. CL § 12–105, in relevant part, reads:
   "(a) *Governmental charges.*—Fees and charges collected at the direction of and actually paid to a government or governmental agency may be collected and are not interest under this subtitle.
   (b) *Service, late, and prepayment charges.*—If the loan contract provides for them, the following fees and charges also may be collected and **are not interest** under this subtitle:

   . . . .

   (3) A **delinquent or late charge** of the greater of $2 or 5 percent of the total amount of any delinquent or late periodic installment of principal and interest, if:
   (i) The delinquency has continued for at least 15 calendar days; and
   (ii) A **delinquent or late charge** has not already been charged for the same delinquency. . . ."

7. CL § 12–910 reads:
   "(a) *Authorized.*—If the agreement governing a revolving credit plan permits, a credit grantor may:
   (1) For a nonconsumer borrower, charge a higher periodic percentage rate of interest on outstanding unpaid payments or portions of payments under the plan which are in default; and
   (2) For any borrower, impose:
   (i) A **late or delinquency charge** on payments or portions of payments; and
   (ii) If payment is made with a check that is dishonored on the second presentment, a charge not to exceed $15.
   (b) *Imposition; disposition; charges not considered interest or finance charges.*—(1) No more than one late or delinquency charge may be imposed for any single scheduled payment or portion regardless of the period during which it remains in default.
   (2) For the purpose of this subsection, all payments by the borrower shall be applied to satisfaction of scheduled payments in the order in which they become due.
   (3) **Charges permitted by this section may not be considered interest or finance charges under the plan.**"

8. CL § 12–1008 reads:

Class IV statutes simply recognize that late charges, or late charges permitted by law, may in fact be assessed. The Class IV statutes are CL § 12–506(a)(6), applicable to retail credit accounts;[9] CL § 12–634(b), applicable to renewals or extensions granted by sales finance companies of retail installment sales contracts;[10] CL § 14–2002(g), applicable to consumer

---

"(a) *Authorized.*—If the agreement governing a loan permits, a credit grantor may:

(1) For a nonconsumer borrower, charge a higher periodic percentage rate or rates of interest on the amount of outstanding unpaid payments or portions of payments under the loan which are in default; and

(2) For any borrower, impose:

(i) A **late or delinquency charge** on payment or portions of payments; and

(ii) If payment is made with a check that is dishonored on the second presentment, a charge not to exceed $15.

(b) *Imposition.*—In the case of a loan to a consumer borrower, no late or delinquency charge may be charged unless the agreement, note, or other evidence of the loan permits. No more than 1 late or delinquency charge may be imposed for any single payment or portion of payment, regardless of the period during which it remains in default.

(c) *Disposition.*—For the purposes of subsection (b) of this section, all payments by the borrower shall be applied to satisfaction of scheduled payments in the order in which they become due.

(d) *Charges not considered interest or finance charges.*—**Charges permitted under this section may not be considered interest or finance charges under the agreement.**"

9.  CL § 12–506(a)(6) reads:

"In an open end account:

. . . .

(6) A seller or financial institution may assess either, but not both:

(i) A **finance charge** equal to the rate of interest charged on past due accounts as provided in the agreement; or

(ii) A **late payment charge.**"

CL § 12–506(a)(6) was enacted by Chapter 753 of the Acts of 1982 (House Bill 1853). In a letter from the Attorney General to the Governor, dated May 21, 1982, and on file with the Department of Legislative Services in the Bill File on House Bill 1853, the purpose of § 12–506(a)(6) is described to be "to permit the issuers of certain travel and entertainment credit cards that do not impose finance charges on their accounts to impose a late fee."

United's accounts are not retail credit accounts, CL § 12–501(j), (*l*), and (*o*), and it is not a financial institution. CL § 12–501(g) and (*l*)(2).

10.  CL § 12–634(b) reads:

motor vehicle leases;[11] RP § 8–401(e), dealing with summary ejectments;[12] RP § 11A–110(e)(1), part of the Maryland Real Estate Time–Sharing Act;[13] RP § 11B–105, part of the Maryland Homeowner's Association Act;[14] and RP § 14–202(b),

---

"The extended principal may not exceed the aggregate amount of the unpaid portion of the time balance under the agreement, **any delinquency charges** lawfully payable, and any amount of cash actually refunded to the buyer, less a credit for prepayment computed as if the unpaid portion of the time balance had been paid in full at the time of the renewal, extension, or refund."

11. CL § 14–2002(g) reads:
"(1) If the lease permits, a lessor may impose on the lessee:
(i) A **late or delinquency charge** for payments or portions of payments that are in default under the lease;
(ii) A collection charge, which may include all court and other collection costs actually incurred by the lessor and, if the lease is referred for collection to an attorney who is not a salaried employee of the lessor, a reasonable attorney's fee; and
(iii) If any payment is made to the lessor with a check that is dishonored on the second presentment, a charge not to exceed $15.
(2) No more than one **late or delinquency charge** may be imposed for any single payment or portion of payment, regardless of the period during which it remains in default."

12. RP § 8–401(e) reads:
"In any action of summary ejectment for failure to pay rent where the landlord is awarded a judgment giving him restitution of the leased premises, the tenant shall have the right to redemption of the leased premises by tendering in cash, certified check or money order to the landlord or his agent all past due rent and **late fees**, plus all court awarded costs and fees, at any time before actual execution of the eviction order. This subsection does not apply to any tenant against whom 3 judgments of possession have been entered for rent due and unpaid in the 12 months prior to the initiation of the action to which this subsection otherwise would apply."

13. RP § 11A–110(e)(1), in relevant part, reads:
"(ii) As to a time-share estate, assessments, **interest, late charges**, costs of collection, and reasonable attorney's fees may be enforced by the imposition of a lien under the Maryland Contract Lien Act....
(iii) As to a time-share license, the person who has the duty to make assessments shall have the rights of a secured party under § 9–504 of the Commercial Law Article to sell, lease, or dispose of the time-share license. Unless the time-share instrument otherwise provides, fees, charges, **late charges**, fines, and interest charged are enforceable as assessments under this section."

14. RP § 11B–105, in relevant part, reads:

part of the Maryland Contract Lien Act.[15]

If one views the Class I, II, and III statutes against the background of the common law rule, these statutes permit that which would otherwise be unpermitted, as contrasted with regulating that which is permitted, but otherwise would be unregulated. Reinforcing this conclusion are the disclaimers stating that certain statutorily authorized late charges are not interest. These disclaimers reveal concern, if not an underlying legal conclusion, that the late charges, absent statutory authorization, would constitute interest on the presently due and payable debt and would be subject to the limitations on interest.

The Class IV statutes may present a separate problem of statutory construction. Nevertheless, for purposes of this opinion, we shall assume that the Class IV statutes also change the common law rule with respect to damages for a default under a contract to pay money.

Under the Cable Communications Policy Act of 1984, 47 U.S.C. § 521, *et seq.*, Congress has expressly provided that cable companies "shall not be subject to regulation as a common carrier or utility by reason of providing any cable service." *Id.* § 541(c). Further, we shall assume, as United argues, that the "benchmark" subscription rates set by the

---

"(b) *Information to be supplied by vendor.*—The vendor [of a lot in a development containing more than 12 lots to a member of the public who intends to occupy or rent the lot for residential purposes] shall provide the purchaser the following information in writing:

. . . .

(11) A statement regarding:

. . . .

(vii) Whether lot owners will be **assessed late charges** or attorneys' fees **for collecting unpaid fees or assessments and any other consequences for the nonpayment of the fees or assessments.**"

15.   RP § 14–202(b) reads:
 "A lien may only secure the payment of:
  (1) Damages;
  (2) Costs of collection;
  (3) Late charges permitted by law;  and
  (4) Attorney's fees provided for in a contract or awarded by a court for breach of a contract."  .

Federal Communications Commission for United's basic and expanded basic service do not include the types of costs which United contends make its five dollar late charge a valid liquidated damage provision.

■ Thus, there is no statute that authorizes or regulates United's late charges so that United's late charge remains subject to the common law rule.

### C

The parties have cited us to cases that reason from the premise that costs of the collection process are recoverable as damages for breach of a contract to pay money. Because of the difficulty in proving actual expenses incurred as a result of any particular breach, these cases recognize that a late charge may be sustained as a liquidated damages provision. In those cases in which the late charge was held to be a penalty, the courts applied what we might call a cost accounting approach and concluded that the amount of the liquidated damages was not a reasonable estimate of the actual damages. *See United Order of Am. Bricklayers & Stone Masons Union No. 21 v. Thorleif Larsen & Son, Inc.*, 519 F.2d 331 (7th Cir.1975) (ten percent of delinquent contribution by employer to employees' benefit fund sustained); *Travelers Ins. Co. v. Corporex Properties, Inc.*, 798 F.Supp. 423 (E.D.Ky.1992) (four percent charge based on unpaid amounts under commercial mortgage that accrued from initial delinquency to acceleration of debt sustained); *In re White*, 88 B.R. 494 (Bankr.D.Mass.1988) (five percent of installment due on bank loan sustained); *Hitz v. First Interstate Bank*, 38 Cal.App.4th 274, 44 Cal.Rptr.2d 890 (1995) (minimum three dollar late charge on installments under bank credit card plan held to be a penalty); *Beasley v. Wells Fargo Bank, N.A.*, 235 Cal.App.3d 1383, 1 Cal.Rptr.2d 446 (1991) (three dollar minimum late charge on installments due under bank credit card plan held to be a penalty); *Clermont v. Secured Inv. Corp.*, 25 Cal.App.3d 766, 102 Cal. Rptr. 340 (1972) (late charge per delinquent installment of one percent of the original amount of loan; case remanded for

liquidated damages, as contrasted with usury, analysis); *Pierce v. B & C Elec., Inc.,* 104 Ill.App.3d 309, 60 Ill.Dec. 65, 432 N.E.2d 964 (1982) (ten percent charge on delinquent contributions by employer to employees' benefit fund sustained); *Nylen v. Park Doral Apartments,* 535 N.E.2d 178 (Ind.Ct.App.1989) (two dollar per day per person late fee on residential apartment rent sustained); *Sun Ridge Investors, Ltd. v. Parker,* 1998 Ok. 22, 956 P.2d 876 (1998) (absent evidence from landlord showing actual costs, five dollar per day late fee on delinquent rent held to be a penalty); *Highgate Assocs., Ltd. v. Merryfield,* 157 Vt. 313, 597 A.2d 1280 (1991) (late payment charge on rent for residential apartment of five dollars on sixth day of delinquency and one dollar for each day thereafter sustained).

The Court of Special Appeals, applying Virginia law, has concluded, after citing numerous cases, that "[t]he modern view seems to be that [late charges] are not penalties but reasonable compensation in commercial transactions[.]" *Mattvidi Assocs. Ltd. Partnership v. NationsBank of Virginia, N.A.,* 100 Md.App. 71, 91, 639 A.2d 228, 238 (1994).

United also makes a policy argument. Invalidating the five dollar late fee, United predicts, will simply result in spreading the cost of the delinquencies in payment across all subscribers, in contrast with assessing the late charge against delinquent payors who are responsible for increased costs. Furthermore, we have little doubt that it would be almost impossible to find a competent economist who would conclude that the costs incurred by United in addressing account delinquencies do not exceed six percent per annum interest on the amount of a delinquent payment.

Nevertheless, the Maryland common law rule of damages for the breach of a contract to pay money should not be changed by judicial decision. This is because of the intimate connection between that common law rule and Article III, § 57 of the Maryland Constitution which sets the legal rate of interest at six percent unless the General Assembly otherwise provides. Article III, § 57 has remained unchanged since the

adoption of the Constitution of 1867. A constitutional provision setting the legal rate of interest first appeared as Article III, § 49 in the Constitution of 1851. In that form it read: "That the rate of interest in this State shall not exceed six per cent. per annum, and no higher rate shall be taken or demanded, and the Legislature shall provide, by law, all necessary forfeitures and penalties against usury." In its 1851 form the provision was included as Article III, § 50 of the Constitution of 1864. Prior to 1851 statutes had set the legal rate of interest at six percent. *See* Chapter 352 of the Acts of 1845 and the Act of 1705, reproduced in XXVI W.H. Browne ed., Archives of Maryland, Proceedings and Acts of the General Assembly of Maryland, 1704–1706, at 351 (1906).[16]

The constitutionalized public policy of Maryland remains that the legal rate of interest is six percent and that, if any changes in that rate are to be made, they are to be made by the General Assembly. Inasmuch as damages for breach of a contract to pay money are pegged to the lawful rate of interest, a change in that common law rule of damages, absent a statutory basis, would have the same effect as judicially changing the Constitution or as judicially enacting a statute that has not been enacted by the General Assembly.

If we were to change the common law of damages and untether damages for the breach of a contract to pay money from the lawful rate of interest so that liquidated damages in excess of the lawful rate of interest would not, *ipso facto,* be a penalty, it would create a very anomalous situation. The largest class of transactions created by the General Assembly as to which there is no limitation on interest is certain commercial loans. *See* CL § 12–103(e)(1).[17] In these com-

---

**16.** The proposed constitution rejected by the people at the general election held on May 14, 1968, would not have carried forward the provisions of Article III, § 57 of the Constitution of 1867.

**17.** CL § 12–103(e)(1) reads:

"A lender may charge interest at any rate if the loan is:
   (i) A loan made to a corporation;

mercial loan transactions the rule of damages that we apply in this case has no application because there is no rate of interest to which the damages are tethered.

In the instant matter the plaintiffs' class overwhelmingly consists of consumers. If liquidated damages payable by consumers on contracts for the payment of money are to be treated the same as liquidated damages payable by commercial promisors on contracts to pay money, that change in policy should be made by the General Assembly. It would be particularly inappropriate to achieve that effect in the instant matter where, as represented by the promisee, its late charges are not only unregulated but also where the promisee has no competing vendor of cable television services.[18]

---

(ii) A commercial loan in excess of $15,000 not secured by residential real property; or

(iii) A commercial loan in excess of $75,000 secured by residential real property."

**18.** The dissent takes no issue with the Court's description of the measure of damages in contracts for the payment of money. Rather, the dissent seems to express the view that the TCI-subscriber contract is not a contract for the payment of money because the transaction is not a loan. Under the TCI-subscriber contract the subscriber promises to pay the amount billed each month by that month's due date. Thus, the breach by the subscriber is the failure to pay a liquidated amount on or before a specific date.

Unfortunately, the dissent also muddles the TCI-subscriber contract with the time price doctrine that is applicable to credit sales. *See Rothman v. Silver,* 245 Md. 292, 226 A.2d 308 (1967); *Falcone v. Palmer Ford,* 242 Md. 487, 219 A.2d 808 (1966). TCI does not offer its subscribers the choice of a cash price or a credit price for its services. TCI has one price, a cash price, that is due six days after the service cycle begins. TCI's contract in fact disclaims that it offers any type of credit.

The dissent interprets the TCI-subscriber contract to give the customer each month the option of paying by the due date or of paying an additional five dollars. One may fairly ask when, under the dissent's analysis, does the deferred payment become due? Under the dissent's view, it cannot be the due date that has been missed, so that the earliest available alternative is the due date for the next succeeding month. Under that approach, what prevents the subscriber from performing in the optional manner again by paying only another five dollars? Under the dissent's theory there is no expressly determinable date by which the outstanding balance must be paid.

D

█ We hold that United's five dollar late fee is a penalty and not a valid liquidated damages provision. We need not and do not hold that United's late charge is usurious. We hold only that, because United's damages are fixed by common law to an easily determined amount, United's attempt to increase the damages by a liquidated damages provision produces a penalty. Consequently, we intimate no opinion on whether late charges in other types of transactions, particularly those falling within Class IV, *see* Part II.B, *supra,* are or are not interest.

Accordingly, the award of $6,701,503.60 to the Plaintiffs' class, as compensation for unlawful penalties from November 7, 1992, through September 20, 1997, is affirmed. That award represents the $4.50 difference between the penalty amount of five dollars and the actual damages of fifty cents as found by the trial court. Under our analysis United's actual damages are standardized at one-half of one percent per month on the overdue balance in a customer's account. Using twenty dollars as the agreed price for a basic account, the standardized damages would be a monthly late fee of ten cents ($20 × .005). Thus the circuit court's calculation using fifty cents as the actual damages did not harm United, and there is no cross-appeal by the Plaintiffs.

For the same reasons we affirm the circuit court order, entered as part of its stay, which directs United to deposit late fee collections in excess of fifty cents into escrow.

II

In this Part II we address the award of counsel fees. United submits that the fee of one-third of the common fund,

---

The way in which open-end credit plans avoid this problem and create a determinable due date is by inserting a requirement for a minimum payment per month. Under the TCI-subscriber contract the minimum payment is 100% of the outstanding balance to be paid by the due date of the cycle being billed.

awarded by the circuit court to be paid out of that fund, is excessive. United asks this Court to review that fee.

■ This request for review is met by the Plaintiffs' objection that United has no standing. Citing *Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), the Plaintiffs argue that, because the counsel fee is to be paid from the common fund and is not an addition to it, United has no interest in the fund. In the instant matter that issue is not presented. The circuit court's order concerning administration of the payment of claims from the common fund gives United the right "to recoup against any amount of excess late fee to be refunded to a Class member, any amount due to [United], without interest, by that Class member." Under this provision United has an interest in minimizing the amount by which the common fund is reduced by counsel fees. Accordingly, United has standing.

The portion of the circuit court's final judgment awarding counsel fees reads in relevant part as follows:

> "The Court hereby awards an attorneys' fee of one-third (⅓) of the Common Fund as of the date (after any and all appeals of this Final Judgment have been determined or exhausted) that the first ... advertisement appears.... In determining the reasonableness of the one-third (⅓) attorneys' fee award, the Court has considered and applied the factors set forth in the Maryland Code of Professional Responsibility with respect to attorneys' fees." [19]

---

**19.** The reference is to the Maryland Rules of Professional Conduct, 2 Maryland Rules 434 (1999). Rule 1.5(a) sets forth the following factors:

> "(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;

■ At the first level of their argument, Plaintiffs contend that the circuit court's fee award is within the circuit court's discretion because, in common fund cases, the fee awarded should be a percentage of the fund. United, on the other hand, argues that a lodestar approach is the proper rule. *Compare Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C.1993) (holding that a percentage of the common fund is the proper approach to counsel fees) *with Kuhnlein v. Department of Revenue*, 662 So.2d 309, 314 (Fla.1995) (holding that the lodestar approach is the proper measure of counsel fees in common fund cases). There is no need in the present case for this Court to mandate a particular methodology. As the circuit court described its process, it determined the award basically as a percentage of the fund, and then checked that result against the factors in Model Rule of Professional Conduct 1.5(a). This is a blend of the approaches advocated by the parties, and, as a methodology, it was within the discretion of the circuit court. The award of counsel fees, however, is reversed and remanded for reconsideration because we have concerns over the manner in which the circuit court applied its announced methodology.

■ In the instant matter there is a contingent fee agreement between the named Plaintiffs and counsel for the class of Plaintiffs. It provided for a fee of one-third of the recovery. At the hearing on the Petition for Counsel Fees, the circuit court raised the question whether that contract was determinative. As guidance for the circuit court on remand, we hold that the percentage of a contingent fee in the contract between counsel for the Plaintiffs and the named Plaintiffs is not

---

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent."

*Id.* at 448.

controlling. We agree with the Supreme Court of Florida when it said:

> "[I]f the court allowed the written fee agreements to control the fee to be awarded from the common fund, it would be enforcing fee agreements to which the vast majority of class members did not consent. Thus, the fact that class counsel and the named parties agreed that attorney fees would be calculated on a percentage basis cannot control what approach the court should use in exercising its inherent power to determine reasonable attorney fees to be paid from the common fund."

*Kuhnlein,* 662 So.2d at 314.

■ Once there has been a recovery in a common fund class action case, a conflict arises between counsel for the representative plaintiffs and the class. Because the stake of an individual class member is usually quite small, and because the judgment against the defendant is not ordinarily affected by the portion of the common fund that is awarded to plaintiffs' counsel, it becomes the duty of the court to insure that the interests of the class members are protected. Thus, if a court concludes first to determine an appropriate percentage of the fund as the fee, it should do so utilizing a market approach, *i.e.,* "the fee customarily charged in the locality for similar legal services[.]" Maryland Rule of Professional Conduct 1.5(a)(3). The court should determine the approximate percentage of a potential multi-million dollar recovery that a business person would be able to negotiate with counsel of the caliber of plaintiffs' counsel in a case of comparable complexity. See *In re Continental Illinois Sec. Litig.; Steinlauf v. Continental Illinois Corp.,* 962 F.2d 566 (7th Cir.1992). In the current market for legal services it is not at all uncommon for the owners of very large, potential claims to seek bids on the legal work involved.

### III

For all the foregoing reasons the judgment for excess late charges and prejudgment interest is affirmed. The award of

counsel fees is reversed and remanded for further consideration consistent with this opinion.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.*

*COSTS IN THIS COURT TO BE PAID BY THE APPELLANT, UNITED CABLE TELEVISION OF BALTIMORE LIMITED PARTNERSHIP.*

CHASANOW, Judge, dissenting:

The majority opinion may be a good example of why appellate courts should not decide cases on issues neither briefed nor argued by parties. The Court decides that, absent express statutory authority, any contractual late fee for failure to make a timely payment of money is limited to the 6 % per annum rate of interest provided for in the MARYLAND CONSTITUTION, Article III, § 57. The majority fails to recognize that there may be good reasons why the able counsel representing the class action plaintiffs and the *amici curiae* never made the contention that the late fees were limited to permissible interest on the unpaid amounts.

The majority seems to base its holding on common law rules, but in doing so it may be mixing up and misapplying several of them. Our starting point must be the mutual contractual promises made between United and the class action plaintiffs. The contracts at issue require United to provide the class action plaintiffs with cable services by wiring the customers' homes, loaning the customers cable equipment, and sending out the video transmissions over the cables. The contracts also require the class action plaintiffs to pay for the services in advance, and if they fail to do so the customers agree to pay a $5.00 late fee. The contracts further provide that the class action plaintiffs will return the cable equipment to United if the contract is terminated. It is indisputable that the contracts require pre-payment for cable service and use of

cable equipment and are not in any way loans of money to the customers by United.

Article III, § 57, as well as most of the cases and authorities cited by the majority, are inapplicable because they are limitations on usury. The majority does not seem to recognize that prohibitions against usury are applicable to loans, forbearance, and equivalent transactions but are not applicable to all promises to pay money. Relevant to the resolution of the instant case is the general rule that usury laws are not applicable to sales not involving the loan of money. "Since the number one element of usury is that there must be a loan or forbearance of money, it is clear that a sale of property cannot be usurious." 14 WILLISTON ON CONTRACTS § 1688A, at 737 (3d ed.1972)(footnote omitted); *Rothman v. Silver*, 245 Md. 292, 299, 226 A.2d 308, 312 (1967). What we have in the instant case is one monthly price if the customer pays in advance, and if this is not done, then there is an additional $5 charge for extending credit when the customer has used the service before paying.

A sale of goods on credit at a price that is greater than the cash price by an amount in excess of the legal rate of interest on the cash price is not subject to usury laws as it is a sale and not a loan of money. *Falcone v. Palmer Ford*, 242 Md. 487, 219 A.2d 808 (1966). In *Falcone*, this Court discussed the history of the rule that usury limitations do not apply to sales. We stated:

"In *Beete v. Bidgood*, 7 B. & C. 453, 108 Eng. Rep. 792, where an estate, the cash value of which was sixteen thousand pounds, was sold for twenty thousand eight hundred pounds payable in stated installments (the added four thousand eight hundred pounds would have made the transaction usurious if it had been a loan of money), it was held in 1827 that the case arose 'out of a contract for the sale of an estate, and not for the loan of money. * * * (And) in that there was no illegality.'

The Supreme Court adopted the same view in 1861 in *Hogg v. Ruffner*, 66 U.S. (1 Black) 115, 17 L.Ed. 38, noting

that to constitute usury there must either be a loan and the taking of usurious interest or the taking of more than legal interest for the forbearance of a debt or sum of money due, and holding:

'But it is manifest that if A propose to sell to B a tract of land for $10,000 in cash, or for $20,000 payable in ten annual instalments, and if B prefers to pay the larger sum to gain time, the contract cannot be called usurious. A vendor may prefer $100 in hand to double the sum in expectancy, and a purchaser may prefer the greater price with the longer credit; and one who will not distinguish between things that differ, may say, with apparent truth, that B pays a hundred per cent. for forbearance, and may assert that such a contract is usurious; but whatever truth there may be in the premises, the conclusion is manifestly erroneous. Such a contract has none of the characteristics of usury; it is not for the loan of money, or forbearance of a debt.'

Our predecessors took the same view. *Williams v. Reynolds,* 10 Md. 57, held that for there to be usury there must be a loan of money and that the sale of a valid promissory note at a discount was not usurious because there was an actual sale and not a loan. *Bailey v. Poe,* 142 Md. 57, 120 A. 242, took the same view.

Almost all states recognize and apply this rule. See the discussion in *Judicial and Legislative Treatment of 'Usurious' Credit Sales,* 71 Harv. L.Rev. 1143 (1958), and *Usury—Applicability of State Usury Laws to Installment Sales,* 62 Mich. L.Rev. 1268 (1964); and see 6A Corbin, Contracts § 1500. Some typical relatively recent cases which are illustrative are: *Lincoln Loan Service, Inc. v. Motor Credit Co., Inc.* (Mun.Ct.App.D.C.), 83 A.2d 230; *Luchesi v. Capitol Loan & Finance Co.* (R.I.), [83 R.I. 151,] 113 A.2d 725; *Steffenauer v. Mytelka & Rose, Inc.* (N.J.Super.), [87 N.J.Super. 506,] 210 A.2d 88; *Carolina Industrial Bank v. Merrimon* (N.C.), [260 N.C. 335,] 132 S.E.2d 692; *Uni–Serv Corp. of Mass. v. Commissioner of Banks* (Mass.), [349 Mass. 283,] 207 N.E.2d 906."

*Falcone,* 242 Md. at 496–97, 219 A.2d at 812. *See also Stewart v. Building Association,* 106 Md. 675, 682, 68 A. 887, 890 (1907)(there is nothing usurious or oppressive in a contract with a building and loan association requiring a member to pay fines for neglect to pay dues and interest).

As mentioned, the contract in the instant case is a contract for the sale of services and use of equipment—it is not a loan. The buyer agrees to pay "in advance" a cash price of $X for the services, but if the advance payment is not made and credit (in the form of advance services) is extended, the customer pays $X + $5 for the services. In other words, the monthly charge is $20 if paid in advance, but if services for the month began and there is no payment by the due date, the charge for that month is $25. The contracts at issue here are not loans of money regulated by the usury laws. The 6% limitation of Article III, § 57, is simply not relevant to these contracts. The only limitation on a liquidated damage late charge is that it must not be a penalty; therefore, the 6% interest cap on usury rates should not be applied to a limitation on late charges that may be assessed on a valid contract that is not a loan but, instead, is a sale of goods and services.

Alternatively, the majority seems to hold that the $5 late fee is not a valid liquidated damage provision but is a penalty because United suffered no damages except the temporary loss of the money and 6% interest is all that was lost. This appellate fact finding is not only contrary to the findings of the trial judge, but is clearly erroneous. The customer is required to pay in advance before using United's equipment to receive United's transmissions. At the time the late fee is assessed, the customer is retaining United's equipment and receiving the cable transmissions without having paid for the service. This leads to two permissible elements of United's damages beyond the mere loss of the monthly payment.

First, the usury laws generally do not preclude contractual promises to pay reasonable costs of collection in additional to interest for overdue payments. United had ample evidence supporting its need for an in-house collection system for

delinquent customers. Even when the contracts are loans regulated by the usury laws, this Court has never before held that a promise to pay reasonable costs of collection is void or limited to the amount of permissible interest on the payment. Contractual attorney's fees and court costs are forms of permissible collection costs and have not been limited by the amount of permissible interest, even with loan transactions regulated by the usury laws. In the instant case, United presented an abundance of evidence, not refuted or rejected by the majority, that its collection costs were reasonable and necessary because of the nature of its business. United's Customer Agreement states:

"If you do not pay your bill by the due date, you agree to pay us an administrative fee for late payment. The administrative fee is intended to be a reasonable advance estimate of our costs that result from customers' late payments.

We do not anticipate that you will pay your bill late and the administrative fee is set in advance because it would be difficult to determine the costs associated with any one particular late payment. We do not extend credit to our customers and the administrative fee is not interest, a credit service charge or a finance charge."

Contractually agreed to costs of collection should not make a loan usurious as long as the contractual costs are necessary and reasonable. The majority fails to tell us why the contractual agreement to pay costs of collection is impermissible.

Second, even if this contract could be construed as a loan of money and thus regulated by the usury provisions, since United proved a customer's failure to pay in advance as per the contract caused it injury beyond just the loss of the monthly payment, United should not be limited to 6% interest. The section of 5 A.L. CORBIN, CORBIN ON CONTRACTS § 1065, at 373–74 (1964), cited by the majority makes it clear that, if the promisee has some special injury beyond just non-receipt of the money, liquidated damages are not limited to the interest value of the money, and it is only "[i]n the absence of a showing that such special injury exists, [that] advance agreements are held to be unenforceable if the sum exceeds the

interest value." CORBIN ON CONTRACTS § 1065, at 374–75. Had the customers subject to the late fees not possessed United's cable boxes and other equipment or returned the equipment as soon as they defaulted, United's damages arguably could be limited to the interest on the money, but the evidence showed otherwise.

By the time the late fees were assessed, the customers were using the plaintiff's equipment to receive the cable services for which they had not paid. The plaintiff class of defaulting customers seeking return of the $5 late fee included not only those who used cable services and equipment in violation of their agreements to pay in advance but also those whose failure to pay on time required United to undergo the additional expenses of cutting off the service and attempting to retrieve the equipment. These additional damages, incapable of precise proof, caused by the late paying class action plaintiffs, are the *raison d'etre* for the $5 liquidated damage provision.

The majority opinion may have significant implications. If, as the majority holds, all late fees contained in all contracts to pay money constitute interest, then the maximum late fees are 6% per year unless the legislature expressly provides otherwise. Statutes merely mentioning late fees would not seem to be legislative authorization for unlimited interest beyond 6%, so what the majority styles "Class IV statutes" would not seem to permit interest charges over 6% per year or .5% per month. I suspect there are great numbers of contracts that may be rendered usurious by the majority opinion, and class action lawyers will have vast new vistas to explore. In addition, how late fees of .5% per month will be continuously computed should present a challenge. Finally, I question how the majority can raise the issue of usury *sua sponte*, hold that all late fees over 6% per annum are usurious, but still permit United to retain a usurious late fee of $.50 per month. The majority should undertake to review the trial court's determination based on the arguments of the parties, and determine whether the $5 late fee is a valid liquidated damage provision or an impermissible penalty. I respectfully dissent.