887 A.2d 637

Tamala BOYD, et al.

v.

BELL ATLANTIC–MARYLAND, INC., et al.

No. 11, Sept. Term, 2005.

Court of Appeals of Maryland.

Dec. 8, 2005.

Ronald B. Rubin (Elisabeth S. Rubin and Michael A. Stodghill of Rubin & Rubin, Chartered, Rockville); Michael J. Quirk (F. Paul Bland, Jr. of the Trial Lawyers for Public Justice, Washington, DC), all on brief, for Petitioners.

John S. Beins (Seth D. Goldberg and Paul D. Gleiberman of Beins, Goldberg & Gleiberman, Washington, DC; Connie Kratovil Lavelle of Law Offices of Connie Kratovil Lavelle, Stevensville; Kevin J. McCarthy of McCarthy & Costello, L.L.P., Bowie); Ira H. Raphaelson (Brian Brooks of O'Melveny & Myers, L.L.P., Washington, D.C.; Bruce Marcus of Marcus &

Bonsib, Greenbelt); Susan Stevens Miller, Gen. Counsel, Maryland Public Service Com'n, Baltimore, all on brief, for Respondents.

Suzanne Sangree, Director of Appellate Advocacy, Baltimore, brief of Amici Curiae the Public Justice Center, Professors Michael Ambrosio, Robert Dinerstein, James McCall, Michael Meltsner, Vanessa Merton, and Ellen Yaroshefsky.

Argued before BELL, C.J., RAKER, WILNER, HARRELL, GREENE, JOHN C. ELDRIDGE, (Retired, Specially Assigned) and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

WILNER, Judge.

This appeal arises out of two class action suits in the Circuit Court for Prince George's County—the *Dotson* and the *Scrocco* cases. Both actions, which were consolidated in the Circuit Court, are against Bell Atlantic–Maryland, Inc. (now known as Verizon) and the Maryland Public Service Commission (PSC).

Over the objection of some members of the *Dotson* class, the court, on November 22, 2004, gave "final" approval to a settlement of the two actions, subject to certain further proceedings that would determine how a reserved amount of $12,500,000 would be divided between (1) a *cy pres* group of Bell Atlantic customers that likely includes most of the class members, and (2) the attorneys for the class and attorneys for certain objecting members of the class. The objecting *Dotson* class members noted this appeal from the order approving the settlement. The Court of Special Appeals dismissed the appeal as one not allowed by law, and we granted *certiorari* to review that decision. We agree in part and disagree in part with the judgment of the Court of Special Appeals.

In response to motions to dismiss the appeal, the appellants contend that the November 22 order is appealable because, notwithstanding that it does not finally resolve how much the class members (or anyone else) will actually receive from the settlement, it nonetheless constitutes a final judgment in the matter. Alternatively, they note that one aspect of the order

was a directive barring class members from asserting claims encompassed by the settlement in any other court or tribunal. They regard that directive as being in the nature of an injunction which, even if interlocutory in nature, is immediately appealable under Maryland Code, § 12–303(3)(i) of the Cts. & Jud. Proc. Article. We shall hold that, whatever may have been the intention of the Circuit Court, the November 22 order does not constitute an appealable final judgment. As to the directive, we shall conclude that it is, indeed, in the nature of an interlocutory injunction that may be immediately appealed, but that it was an abuse of discretion for the court to enter that directive as part of what we conclude was an interlocutory order.

### BACKGROUND

In the 1980's and 1990's, it became fashionable for sellers of goods, services, or credit to impose a "late fee" when their customers failed to pay amounts due on time. The rationale often expressed for those fees, in addition to permitting the seller to recover the time value of the money not paid when due, was that, when customers defaulted in that manner, collection efforts of one kind or another were often necessary, that the cost of those efforts should fall directly on the defaulting customers rather than indirectly on the larger base of compliant customers through higher charges for the goods or services provided, and that late fees were an appropriate way of so directing that burden.

There never was a legal impediment to the charging of late fees. In *United Cable v. Burch*, 354 Md. 658, 732 A.2d 887 (1999), however, we pointed out that late fees were in the nature of interest on the unpaid amount due, that Article III, § 57 of the Maryland Constitution limited the legal rate of interest to 6% per annum unless otherwise provided by the General Assembly, and that, absent statutory authority to the contrary, any late fee in excess of that amount constituted an unlawful penalty. Because almost all late fees then charged by merchants exceeded the 6% per annum Constitutional limit, that decision sparked not only an immediate legislative re-

sponse permitting such higher fees but a host of additional opportunistic class action lawsuits, including the ones now before us.

Unlike the merchant involved in *United Cable*—a largely unregulated cable television company—Bell Atlantic, a provider of telephone service, was a public utility subject to extensive regulation by the PSC. *See* Maryland Code, Public Utility Companies Article, §§ 2–112 (general jurisdiction and powers of the PSC), 2–113 (general supervisory and regulatory power of PSC), 4–201 (requiring a public service company to charge "just and reasonable rates" for the utility services it renders), and 4–102 (empowering the Commission to set just and reasonable rates of public service companies). *See also* § 4–301, permitting the Commission to regulate a telephone company through "alternative forms of regulation."

As early as 1982, the PSC, by a formally adopted regulation, had authorized gas and electric utilities to charge a late fee to residential and business customers who did not pay within a fixed number of days after rendition of the monthly bill. The late fee initially authorized was 3% of the net bill, although that was lowered in 1985 to 1.5%.[1] *See* 9:16 Md. Reg. 1608 (Aug. 6, 1982) and 12:23 Md. Reg. 2223 (Nov. 8, 1985). In 1995, the Commission amended the regulation to generally permit telephone companies to charge their customers such a late fee as well. See 22:15 Md. Reg. 1120 (July 21, 1995); COMAR 20.30.03.01. Another part of the regulation, COMAR 20.30.03.03, required that the collection of late fee charges be consistent with the tariff provisions of the particular utility, however, which meant that it was subject to Commission approval.

---

1. For residential customers, the 1.5% late fee applied to the amount of the current bill (Bill 1) if not paid within 20 days. The regulation permitted an additional charge of 1.5% on the amount of that bill remaining unpaid after the next bill (Bill 2) was rendered and a further charge of 2% on the amount remaining unpaid on Bill 1 after the second succeeding bill (Bill 3) was rendered, for a maximum of 5% on unpaid portions of Bill 1. Late fees were also authorized for business customers who did not pay within 15 days after a bill was rendered.

In June, 1995, Bell Atlantic sought PSC approval of an amended tariff that would permit the charging of late fees to business customers, and, in September of that year, it sought approval to charge late fees to residential customers. The amended tariffs were stated to be revenue-neutral, *i.e.*, the additional revenue expected to be earned by Bell Atlantic from the late fees would be offset by reductions in other charges. In July, 1995, the Commission approved the amended tariff for business customers. It initially rejected the proposed changes in the residential tariff but, in January, 1996, approved a revised application. Those approvals permitted Bell Atlantic, insofar as the PSC was concerned, to charge both residential and business customers the late fees authorized by the COMAR regulation, and the company proceeded to impose those fees. Between 1996 and 2000, Bell Atlantic collected nearly $59.1 million in late fees from residential customers and approximately $27.4 million from business customers. There is no contention that those additional revenues were not fully offset by the reductions specified in the amended tariffs.[2] It has been estimated that approximately $64 million of that amount was in excess of the 6% Constitutional limit.

In September, 1999, less than two months after our decision in *United Cable* was filed, four plaintiffs—the *Dotson* plaintiffs—filed the first of these actions on behalf of an alleged class of residential customers of Bell Atlantic. They averred that the 1.5% late fee charged by the company pursuant to the PSC-approved tariff was unlawful to the extent it exceeded the 6% per annum limitation set forth in Art. III, § 57 of the State Constitution. In their second amended complaint filed three months later, they sought (1) a declaratory judgment that the 1995 amendment to the COMAR regulation, permitting late fees to be charged by telephone companies, was

---

2. In connection with motions filed in the *Dotson* case, the plaintiffs contended that the income received by Bell Atlantic from the late fees was not revenue neutral *as to the plaintiff class*—that the late fees they paid exceeded any reduction in cost for other services—but it does not appear that they ever asserted or produced evidence to show that the late fee revenue was not fully offset as to Bell Atlantic.

invalid under Art. III, § 57 of the Constitution, (2) a judgment in favor of the plaintiff class in the amount of all late fees paid and the amount of profit earned by Bell Atlantic on those late fees, plus pre-judgment interest, and (3) an injunction prohibiting Bell Atlantic from collecting late fees in excess of 6% per annum. The counts seeking a monetary award were based on a claim for restitution of unlawful penalties (Count I) and unjust enrichment (Count II). The declaratory judgment action was in Count III.

In December, 1999, Bell Atlantic and the PSC moved to dismiss the action on a number of grounds, including that (1) the late fee did not violate Art. III, § 57 because it was approved by the PSC pursuant to power delegated to that agency by the General Assembly, (2) Count I, for restitution, failed to state a cause of action, (3) because the tariff allowing the late fee was revenue-neutral, there was no unjust enrichment of Bell Atlantic, and (4) the plaintiffs failed to challenge the COMAR regulation or the tariff before the PSC and therefore failed to exhaust available administrative remedies. A month later, the plaintiffs moved for partial summary judgment. In February, 2000, and in accordance with a stipulation, the court certified the *Dotson* class as consisting of all persons, other than the trial judge and members of his immediate family, who were current or former residential subscribers of telephone services provided by Bell Atlantic in Maryland and who paid to Bell Atlantic a late fee that exceeded 6% per annum within the applicable limitations period.

On April 21, 2000, a separate class action was filed in the Circuit Court on behalf of the business customers of Bell Atlantic who had paid late fees. That is the *Scrocco* action. The same kinds of claims were made in that action as in *Dotson*.

While those proceedings were pending, the General Assembly, in its 2000 Session, enacted 2000 Md. Laws, ch. 59, which, through the addition of new § 14–1315 to the Commercial Law Article, expressly permitted the imposition of late fees, subject

to certain limits and conditions. Under § 1 of ch. 59, effective June 1, 2000, late fees imposed in "consumer contracts" were limited to $10.00 per month or 10% per month of the payment amount that was past due, whichever was greater. That provision would remain in effect for only four months. Under § 2 of ch. 59, effective October 1, 2000, a consumer contract could provide, in the alternative, (1) a late fee of up to $5.00 per month or 10% of the amount past due, with a limit of three such late fees for any single payment amount past due, or (2) a late fee of 1.5% per month on the amount past due, with no limit on the number of times such fee could be charged on a single amount remaining past due. A late fee imposed under the new § 14–1315 was made subject to any additional limitations or conditions prescribed by any Federal, State, or local regulatory agency having jurisdiction over entities imposing the fee. It is not entirely clear whether or how the caps were to apply to late fees charged by regulated utilities under residential tariffs.[3]

The Legislature declared the law, which took effect June 1, 2000, applicable retroactively to "all late fees provided for in contracts entered into, or in effect, on or after November 5, 1995" and to "any case pending or filed on or after June 1, 2000." *See* ch. 59, §§ 5, 6. In *Dua v. Comcast Cable*, 370 Md.

---

**3.** Section 14–1315(a)(4) defined a late fee as "any charge or fee imposed because a payment is not made when the payment is due under the terms of a *contract*." (Emphasis added). Section 14–1315(b) permitted parties "to a contract" to "agree to require the payment of a late fee when a party fails to make a payment when the payment is due." The caps were provided for in § 14–1315(f), which applied only to late fees included in a "consumer contract." That term was defined as "a contract involving the sale, lease, or provision of goods or services which are for personal, family, or household purposes." The term "contract" was defined as including "consumer, commercial, and business contracts, covenants, leases of any kind, and tariffs on file with any regulatory agency." In light of that definition, the late fee charged by Bell Atlantic pursuant to its amended tariffs was clearly imposed pursuant to a "contract." It does not appear that the tariff allowing late fees to be charged to *business* customers would constitute a "consumer contract" to which the caps would apply. Whether the residential tariffs constituted a "consumer contract," for the sale of services for family or household purposes is not altogether clear. It is not an issue we need address in this case.

604, 805 A.2d 1061 (2002), we declared the retroactive application of that law unconstitutional.

In May, 2000, after ch. 59 was enacted but before it took effect, the court ruled upon the pending motions to dismiss and for summary judgment. Dealing first with the motions to dismiss, the court found no merit in the general failure-to-exhaust-administrative-remedy defense. As to the 1995 amendment to the COMAR regulation, the court concluded that the attack was on the Constitutional authority of the PSC to adopt the amendment and that a declaratory judgment action was appropriate to make that kind of attack. As to the tariff, the court held that the jurisdiction of the PSC extended to "rates" charged by regulated utilities and that a late fee was not a "rate." Dealing then with the specific counts, the court dismissed the restitution claim in Count I on the ground that restitution is not a separately recognized cause of action but denied the motion to dismiss the unjust enrichment claim in Count II, on the ground that the revenue-neutral nature of the amendment to the tariff did not preclude a finding that it would be inequitable for Bell Atlantic to retain an otherwise illegal penalty.

On the motion for summary judgment, the court concluded that the imposition of a late fee was in the nature of interest, that the Legislature had never delegated to the PSC the authority to modify the 6% per annum interest rate set in the Constitution, and that the 1995 amendment to the COMAR regulation was therefore invalid. In light of ch. 59, expressly permitting late fees in excess of the Constitutional rate, at least from and after June 1, 2000, the court denied the request for prospective injunctive relief. It left open the issue of monetary relief under Count II (unjust enrichment).[4]

The cases wended their way through the litigation thicket for the next 31 months. On December 9, 2002, the named plaintiffs in the *Dotson* and *Scrocco* cases entered into a

4. We recite these rulings as part of the procedural history of the case, not necessarily to indicate our agreement with them.

Stipulation of Settlement with Bell Atlantic. The PSC was not a party to the Stipulation but did not oppose it. Under the Stipulation, Bell Atlantic agreed to make available up to $51.9 million, exclusive of attorneys' fees and expenses and the cost of administering the settlement. Apart from the named members of the classes, who were to receive a $500 incentive award, in order to receive a payment, the individual class members had to file a claim form with an Administrator who would be appointed to administer the settlement, and who, subject to final decision by the court, could reject a claim, or part of a claim in excess of $6.00, if it could not be verified. All claim forms would have to be filed within a defined claims period.

If the claim form was not accompanied by a proof of payment (*i.e.,* a statement under penalty of perjury identifying the late fees paid by the member) or documentary evidence that more than $50 was paid in late fees, the member would receive $6.00, regardless of how much in the way of late fees that member actually paid. If the member submitted a proof of payment with the claim form and the claim (1) was not more than $50, and (2) was approved by the Administrator, he or she would receive an amount equal to 60% of the late fees paid by that member. If the member claimed more than $50, documentary evidence of the amount of late fees paid had to be submitted. Members who were current customers of Bell Atlantic would receive their payment in the form of a credit on their telephone bill. Former customers would receive a check. Because no minimum payment to class members was required—only the $6.00 or 60% based on approved claims—any part of the $51.9 million not paid to class members pursuant to the claim procedure would be retained by Bell Atlantic.

The Stipulation noted that class counsel had prosecuted the cases on a contingent fee basis. Bell Atlantic agreed to pay counsel, subject to the court's approval, fees and expenses not exceeding $13 million, stated to be 20% of the "maximum total consideration made available by [Bell Atlantic] under this Settlement." Counsel would apply to the court for approval of a $13 million award for fees and expenses, and Bell Atlantic

agreed not to oppose that application. That, in the parlance of class action litigation, is known as a "clear sailing" provision. Finally, the Stipulation permitted class members, by April 11, 2003(1) to opt out of the settlement by mailing to the Administrator a request for exclusion, or (2) to file an objection to the fairness of the settlement with the court. On December 12, 2002, three days after the signing of the Stipulation, the court gave preliminary approval to the settlement and set in motion the process for notifying class members.

On April 11, 2003, Tamala Boyd and twelve other members of the *Dotson* settlement class (the Boyd Objectors), filed objections to the settlement. They argued that (1) a claims process for compensating class members was unnecessary and, based on the experience in other class action settlements and the lack of any minimum payment, would likely produce a very small payout, which they estimated would not exceed $5 million, (2) given the expected small payout to class members, the unopposed $13 million counsel fee would probably constitute 70% or more of the total payout by Bell Atlantic and was unreasonable for that reason, (3) the fee was also unreasonable in light of the work performed by counsel, (4) the notice to class members was deficient in failing to disclose the dollar amount of the counsel fee, and (5) in particular, for those members who were not current customers of Bell Atlantic and who did not receive the notice through an insert with their telephone bills, the published notice, consisting of one advertisement in *USA Today* and a posting on the Internet, was inadequate.

Upon the filing of those objections, the judge handling the case recused himself, and the case was assigned to another judge. After a hearing on the objections, the court, on November 12, 2003, denied final approval of the settlement. The court recognized that, although Maryland Rule 2–231 required court approval of any settlement of a class action, it did not articulate any standards for determining either the fairness or the adequacy of a settlement. The court decided to follow the approach taken by the U.S. District Court in *In re Montgomery County Real Estate Antitrust Litigation*, 83

F.R.D. 305, 315–17 (D.Md.1979). As to fairness, it concluded that the focus was on the presence or absence of collusion among the parties:

"Because of the danger of counsel's compromising a suit for an inadequate amount for the sake of insuring a fee, the court is obligated to ascertain that the settlement was reached as a result of good faith bargaining at arm's length. The good faith of the parties is reflected in such factors as the posture of the case at the time settlement is proposed, the extent of discovery that has been conducted, the circumstances surrounding the negotiations and the experience of counsel."

83 F.R.D. at 315. (Citations omitted).

With respect to adequacy, the court determined that the focus was on the likelihood of the plaintiff's recovery on the merits against the amount offered in settlement:

"In assessing adequacy of the proposed settlement, courts should weigh the amount tendered to the plaintiffs against such factors as (1) the relative strength of the plaintiff's case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment; (5) the degree of opposition to the settlement."

*Id.* at 316. (Citations omitted).

Applying those standards, the court found the settlement agreement unacceptable. The court's objection was not based on the amount of payout to the class members but on the fee. One independent basis for that objection was the court's determination that the notice to class members was deficient in not containing sufficient information regarding the $13 million counsel fee. With respect to the amount of the fee, the court rejected counsel's attempt to support the fee on the basis of the extraordinary effort allegedly expended in opposing ch. 59, the court concluding that such lobbying activity may have been less for the benefit of the class than "to

preserve potential fees earned in this and other cases." It rejected counsel's claim that the value of the settlement was $64.9 million (the $51.9 million set aside for class members and the $13 million set aside for the fee), calling that number a "phantom," and thus rejected as well the assertion that the $13 million fee represented only 20% of the value of the settlement. The essence of the court's objection was that the transactional cost—particularly the $13 million counsel fee— "for restoring moneys illegally charged and collected as 'late fees' ranging from $6.00 to $50.00 by Bell Atlantic from individual and business customers are not justified by the small benefit received be Members of the Classes of customers affected . . . "

Concomitant with the order denying final approval of the settlement, the court, by separate order, granted a motion by the Boyd Objectors to intervene in the action. It subsequently certified the *Scrocco* class, dealt with a number of other pending motions, and scheduled trial for late November, 2004. In the Spring of 2004, the parties asked retired Judge John McAuliffe to attempt to mediate the dispute. A mediation session was held on April 8, 2004, with all parties, including the Boyd Objectors, participating. As a result of Judge McAuliffe's efforts and negotiations following the mediation session, the parties, other than the Boyd Objectors, reached a second settlement agreement on June 1, 2004, which, on June 23, 2004, over the objection of the Boyd Objectors, received preliminary approval of the court.

The new agreement differed in a number of respects from the first one. It required Bell Atlantic to pay a minimum of $13.5 million, but not more than $52.9 million, plus any attorneys' fees and expenses awarded by the court, up to $12.5 million. Any class member who timely submitted a valid claim pursuant to the first settlement agreement was excused from having to submit another claim. Payment to other class members would be essentially as provided in the first settlement agreement, *i.e.*, members submitting a timely claim in proper form but without any proof of payment would receive $6.00, while those submitting a timely claim accompanied by a

proof of payment would receive 60% of all late fees paid. If the claim was for more than $50, however, further documentation in the form of bills and checks was required.

There appear to be four principal differences between the first and second settlements. The first difference was the minimum payment requirement of $13.5 million, which was to be implemented as follows: if the total amount of valid claims timely filed by class members in both actions was less than $51.9 million, Bell Atlantic would distribute, as a *cy pres* benefit to its current customers, a minimum amount equal to $13.5 million less the cost of administering the settlement (the total cost of mail notice, publication notice, notice to first settlement claimants, website notice, and fees and expenses of the Settlement Administrator). That benefit was to be in the form of a credit applied to the customers' telephone bills.

The second major change dealt with counsel fees. Section III. B. of the agreement provided that, prior to the fairness hearing, class counsel would petition the court for approval of an award not to exceed $12.5 million in fees and expenses and that the fee petition would be based on a percentage of the total settlement benefits obtained "for the Settlement Class," not to exceed one-third, *or* class counsel's "lodestar" with a reasonable risk multiplier, plus reimbursement of counsel's costs and expenses, which the defendants, as before, agreed not to oppose. The agreement provided that Bell Atlantic would not be required to pay more than $12.5 million in counsel fees and expenses and that, if less than that amount was awarded by the court, the difference would be distributed to the *cy pres* group—Bell Atlantic's current customers—on an equal basis in the form of a credit on their telephone bills.

The third difference was a waiver by Bell Atlantic of its possible right to recoup the cost of the settlement by means of a rate increase. The traditional method by which the PSC regulated public utility rates was to (1) calculate the fair value of the utility's property used and useful in providing service to the public, (2) determine the utility's cost of capital—its required rate of return, (3) multiply that rate of return against

the value of the rate base to determine the amount of income to which the utility was entitled, and (4) require the utility to file tariffs that would produce only that level of income. *See Building Owners v. Public Service Com'n*, 93 Md.App. 741, 753, 614 A.2d 1006, 1012 (1992).

In 1995, the General Assembly enacted what is now codified as § 4–301 of the Public Utility Companies Article, which allows the PSC to regulate the rates charged by telephone companies by alternative means. In November, 1996, the PSC, acting pursuant to that authority, adopted an alternative form of regulating telephone company rates, what it termed a Price Cap Form of Alternative Regulation. *See In the Matter of the Inquiry into Alternative Forms of Regulating Telephone Companies*, Md. PSC, Case No. 8715, Order No. 73011, 1996 WL 769751 (1996).

Under the Price Cap Order, Bell Atlantic's then current rates for residential and business basic services were frozen for three years, following which they would be subject to an indexing formula that considered three factors: an upward adjustment for inflation, a downward adjustment for increased productivity, and an "exogenous costs change factor," which the order referred to as the "Z factor." Exogenous changes involved "factors that are out of [Bell Atlantic's] control and do not affect the entire economy ..." The order permitted Bell Atlantic to propose price adjustments to account for costs "triggered by administrative, legislative or judicial action that are beyond the control of [Bell Atlantic] and not otherwise included in the price cap formula." It specified, however, that:

"Before a cost item is eligible for Z factor treatment, the proponent must demonstrate that: the cost is the result of an exogenous event; this event occurred after implementation of the price cap plan; the cost is clearly beyond management's control; the cost is not a normal cost of doing business; the event has a disproportionate impact on telecommunications providers; the event has a major impact on [Bell Atlantic's] costs; the costs proposed are reasonable; and that actual costs can be used to measure the impact of

the change, or the impact can be measured with reasonable certainty."

The notion that amounts paid out in settlement of the class action suits qualified as an exogenous event that would permit Bell Atlantic to receive a rate increase under the Price Cap Order was not mentioned in the first settlement agreement. The second agreement noted that Bell Atlantic had asserted that prospect throughout the litigation, however, and, as part of the second settlement agreement, Bell Atlantic agreed "to forbear from pursuing such recoupment right" as well as from exercising "any legal or equitable right that [Bell Atlantic] has to recoup the cost of this Settlement by invoking the exogenous change provisions of the Price Cap Order."

Finally, unlike the first settlement, PSC was a party to this one.

The preliminary approval of the second settlement agreement triggered the sending of new notices to the class members and, like the order giving preliminary approval to the earlier settlement, made provision for class members, by October 14, 2004, to opt out of the settlement or to object to it. The Notice also stated that "[o]nce the Court has entered a non-appealable final judgment approving this Settlement, Settlement Class Members will release, and be forever barred from suing, [Bell Atlantic] and other Released Persons for all Released Claims as those terms are defined in the Stipulation of Settlement."

At the end of the claims period, a total of 24,108 claims had been filed by residential and business customers, 17,569 of which had been filed pursuant to the first settlement and were "grandfathered" by the second settlement agreement, and 6,539 of which were filed pursuant to the second round of notices. The total amount of those claims, residential and business, from the first and second round of notices, was $227,334. Among the 24,108 claims filed, 3,027 were regarded by the Administrator as potentially duplicate or invalid for some reason. Because the validity of those claims had yet to

be resolved, the actual value of the claims remained, at the time, still uncertain.

During this period, two of the Boyd Objectors, Kamuhanda and Mitchell, decided to obtain their own counsel, and they began filing separate papers and pleadings. In October, 2004, both the Boyd Objectors and the Kamuhanda Objectors filed objections to the proposed settlement. They argued that the requested fee was excessive, that class counsel had done insufficient discovery in order to determine which Bell Atlantic customers actually paid late fees, and that counsel did not adequately represent the class. The Boyd Objectors sought to remove class counsel for those reasons. Their major objection was that the requested fee of $12.5 million was excessive in relation to the benefit conferred on the class. In that regard, they took special aim at class counsel's and Bell Atlantic's assertion that (1) because, under the agreement, a maximum of $51.9 million was set aside for claims, even though only $227,334 in claims had been filed, the settlement had a value of $51.9 million, and (2) alternatively, in light of Bell Atlantic's waiver of its right to seek recoupment of the settlement payout as an exogenous cost, the true value of the settlement was $52 million.

Given the relatively small amount of claims filed, the actual cash payout provided by the settlement was not $51.9 million but $26 million plus the amount of approved claims, which will not exceed $227,334. The $26 million consisted of (1) the cost of notice and administration, (2) the difference between that cost and $13.5 million, to be paid to the *cy pres* customers, and (3) $12.5 million, to be allocated between counsel and the *cy pres* customers, some significant portion of whom were no doubt also claimants. Class counsel, Bell Atlantic, and the PSC posited, however, that Bell Atlantic had the right to recoup that $26 million as an exogenous cost under the PSC Price Cap Order and that, by waiving that right, the actual value of the settlement was double the $26 million. The objectors regarded that as a phantom number but pointed out that, if the waiver *did* have value, its absence from the first settlement would have made that proposal a travesty. Not to

be left behind in the fee chase, counsel for the Boyd and Kamuhanda Objectors indicated that they, too, would be petitioning for a fee, and counsel for the Boyd Objectors subsequently requested a fee of $3.9 million for the work they had done in opposing the settlement.

On November 22, 2004, following a hearing several days earlier, the court, over the objections of the Boyd and Kamuhanda Objectors, entered an "Order and Judgment Approving Second and Final Settlement." After some preliminary discussion, the court determined, in some of the "ORDERED" paragraphs, that:

(1) the notice to class members was sufficient in both form and content;

(2) the proposed settlement was fair, reasonable, adequate, and in the best interests of the settlement class;

(3) the Stipulation of Settlement "is finally approved in all respects";

(4) all objections were overruled, for reasons to be stated in a later opinion;

(5) class members wishing to submit a proof of claim must do so by December 5, 2004;

(6) upon the "effective date," the class members, by operation of that Order, shall have fully, finally, and forever released and discharged Bell Atlantic and all released persons; and

(7) except for proceedings related to the enforcement of that order, settlement class members "are barred from commencing or continuing any action or proceeding in any court or tribunal asserting any claims encompassed by the Stipulation of Settlement."

The court also dealt with the fee question. In that regard, it approved "the sum of $12,500,000.00" for attorneys' fees, expenses, and any charitable donations counsel chose to make

out of the fee award,[5] and it directed Bell Atlantic to pay that amount to counsel within seven days after the "Effective Date." Counsel was ordered to place that amount in their escrow account "for Distribution at a later date after the completion of further proceedings before the Special Master and this Court in accordance with this and all other consistent Orders of this Court."

That provision was in implementation of an earlier provision in the Order in which the court made clear that it was making no final determination of a fee award, either to class counsel or to counsel for the Boyd or Kamuhanda Objectors, each of whom had also indicated an intent to petition for counsel fees. It noted that it had considered class counsel's fee petition and the objections, and

"further recognizing that Objectors have the right to petition this Court for Attorney's Fees for their counsel when satisfactory evidentiary proof is produced to show that their efforts produced an actual benefit to the Class, this Court concludes that a Special Master is, therefore, necessary to determine what is a fair award and allocation of Attorney's Fees in the above-captioned case."

By separate Order entered the same day, the court confirmed that it was unclear from the record what amount of attorney's fees should be awarded to class counsel or to counsel for the two groups of objectors, and it therefore appointed John Paul Davey as a special master to make recommendations to the court as to fees and expenses to be awarded to class counsel. The master was given authority to issues subpoenas to compel the attendance of witnesses and the production of documents, administer oaths, rule upon the admissibility of evidence, examine witnesses, convene and adjourn a hearing, recommend contempt proceedings, and recommend findings of fact and conclusions of law. The

---

5. Paragraph III. B. 2. of the Stipulation of Settlement provided that, as part of their fee petition, counsel could, but was not required to, request that a portion of their fee and expense award be donated to a charitable institution of their choice.

special master was to make a report of his recommendations, to which exceptions could be filed in accordance with Maryland Rule 2–541.

In the concluding parts of its main order approving the settlement, the court (1) vacated the May, 2000 declaratory judgment invalidating the 1995 amendment to COMAR 20.30.03.01, (2) dismissed the two class actions "in their entirety with prejudice and without costs," and (3) "without affecting the finality of the Order and Judgment hereby entered," reserved jurisdiction "over the implementation of all of the terms of the Settlement, including distribution of the settlement benefits, attorney's fees and expenses, enforcement and administration of the Stipulation, including any releases in connection therewith, and any other matters related or ancillary to the foregoing."

The order approving the settlement was filed November 22, 2004. On December 13, the Boyd Objectors noted an appeal, and on December 17, the Kamuhanda Objectors did likewise. On January 6, 2005, the Circuit Court filed an opinion explaining its reasoning and also an order denying the objectors' motion for stay. The court rejected the objectors' attack on assigning any value to Bell Atlantic's waiver of its supposed right of recoupment as "disingenuous at best and presumptuous at worst." It declined to express any opinion on the value of that waiver, leaving it to the special counsel to determine that issue, but it did express the view that "the waiver of the recoupment right does have some value to the Class and that value is not inconsequential." [6] The court made clear that the

---

6. Because of the lack of a final judgment, the question of whether Bell Atlantic's waiver had any value at all and, if so, what value, is not before us. We do note, however, for the guidance of the court and the special master, that, notwithstanding PSC's joining in the settlement, under the PSC Price Cap Order, recoupment of exogenous costs is not automatic. Bell Atlantic would have to file a petition with the PSC and bear the burden of proving, among other things, that an agreed settlement on its part is, in fact, an exogenous event, that the cost of the agreed settlement was beyond management's control, that it was not a normal cost of doing business, that the event had a major impact on Bell Atlantic's costs, and that the costs proposed are reasonable. Pre-

special master was to recommend an award of attorneys' fees "based on a percentage of the Fund Method cross referenced with the Lodestar Method that are then checked against the factors in the Maryland Rules of Professional Conduct 1.5(a)." The court rejected as well the arguments that class counsel had done insufficient discovery and that they had not properly represented the class.

In discussing the value of the settlement, the court concluded that the settlement had "a maximum cash value to the Class of $51,900,000 *for payment of claims* " (emphasis added), seemingly ignoring the likelihood (and subsequently the fact) that the total value of claims actually filed was less than 0.5% of that amount, plus $1,675,000 for the cost of notice and administration, and $12.5 million to be allocated between counsel and the *cy pres* ratepayers. On that theory, the court calculated the "maximum potential liability" of Bell Atlantic as being $66,075,000, although it immediately recognized that "the actual liability and, therefore, the value of the Settlement is dramatically less than this number."

With its denial of a stay, some proceedings commenced before the special master. On February 4, 2005, the Court of Special Appeals dismissed the appeals for lack of a final judgment. On April 7, 2005, we granted the Boyd and Kamuhanda Objectors' petitions for *certiorari* and stayed further proceedings in the Circuit Court. The allocation of the $12.5 million between class counsel and the *cy pres* group thus remains unresolved, as do the petitions for counsel fees filed by counsel for the two groups of objectors.

---

sumably, the company's ratepayers would be entitled to contest such a request and trigger a contested case proceeding subject to judicial review. We note, as well, that, if Bell Atlantic were successful in recouping its $26,227,334 payout from its ratepayers, most, if not all, of whom would be part of the *cy pres* group benefited by the settlement and some unknown percentage of whom would be members of the actual class of late-fee-payers, the actual value of the settlement would be close to zero. What Bell Atlantic gave with one hand it would take away with the other. If any significant value is ultimately assigned to that waiver, the court will have to explain its rationale in more detail than it did in its opinion of November 22, 2004.

## DISCUSSION

This Court has made clear on many occasions that "the right to seek appellate review of a trial court's ruling ordinarily must await the entry of a final judgment that disposes of all claims against all parties, and that there are only three exceptions to that rule: appeals from interlocutory orders specifically allowed by statute, predominantly those kinds of orders enumerated in Maryland Code, § 12–303 of the Cts. & Jud. Proc. Article; immediate appeals permitted under Maryland Rule 2–602(b); and appeals from interlocutory rulings under the common law collateral order doctrine." *Board of Educ. v. Bradford*, 387 Md. 353, 382–83, 875 A.2d 703, 720 (2005). We have made equally clear that, for an order to constitute a final judgment for purposes of appeal, it must have at least three attributes: "(1) it must be intended by the court as an unqualified, final disposition of the matter in controversy, (2) unless the court properly acts pursuant to Md. Rule 2–602(b), it must adjudicate or complete the adjudication of all claims against all parties, and (3) the clerk must make a proper record of it in accordance with Md. Rule 2–601." *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767, 773 (1989); *Smith v. Lead*, 386 Md. 12, 21, 871 A.2d 545, 550–51 (2005).

Petitioners insist that the November 22, 2004 order satisfies those criteria and therefore constitutes a final judgment. Among other things, they point out, it stated that the Stipulation of Settlement "is finally approved in all respects," it enjoined class members from asserting claims encompassed by the settlement in any other forum, it declared class members who had not timely requested exclusion from the settlement to "be bound by this final Order and Judgment," and it reserved jurisdiction over the implementation of the settlement "without affecting the finality of the Order and Judgment hereby entered." Substantively, they add, the order in fact determined the rights of the parties—the class plaintiffs, on the one hand, and Bell Atlantic and the PSC, on the other. In that regard, they view the class plaintiffs as limited to those members who filed timely and valid claims and as excluding

the *cy pres* group whose entitlement has not yet been finally litigated.

"Ay," quoting the unfortunate Hamlet, "there's the rub." *The Tragedy of Hamlet, Prince of Denmark*, Wm. Shakespeare, Act III, scene i. There are two responses.

█ The only action for monetary relief that survived the initial motions to dismiss was based on unjust enrichment. As we pointed out in *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 776, 501 A.2d 48, 71–72 (1985), the relief available for unjust enrichment is not compensatory damages but restitution—the disgorgement of the benefits that it would be unjust for the defendant to keep. Quoting Dobbs, *Law of Remedies*, § 4.1 at 224 (1973), we noted that "[t]he damages recovery is to compensate the plaintiff and it pays him, theoretically, his losses," but "[t]he restitution claim, on the other hand, is not aimed at compensating the plaintiff but at forcing the defendant to disgorge benefits it would be unjust for him to keep." *See also Consumer Protection v. Morgan*, 387 Md. 125, 168–69, 874 A.2d 919, 944–45 (2005); *Luskin's v. Consumer Protection*, 353 Md. 335, 383–84, 726 A.2d 702, 726 (1999).

The *cy pres* group was critical—indeed indispensable—to provide that kind of restitutionary relief. The first settlement, rejected by the court, omitted that feature, which, apart from other problems, alone made the settlement unfair and inadequate.[7] With evidence that Bell Atlantic had collected some $64 million in unlawful late fees over the requisite period, a payout of $227,334 to those late fee payers who filed claims, though perhaps adequate as compensatory damages, could hardly be regarded as anything approaching adequate restitutionary relief. Even if the actual class consisted only of the late fee payers, given the relatively small value of the claims filed by those members, the fairness and adequacy of

---

7. It was stipulated that approximately $156,000 in claims were filed pursuant to the first settlement. It cannot seriously be suggested that the prospect of a $13 million counsel fee based on a $156,000 payout to clients was fair or adequate to the clients. *See Attorney Griev. Comm'n v. Korotki*, 318 Md. 646, 569 A.2d 1224 (1990).

the settlement hinged predominantly on the amount that would be paid to the *cy pres* group. Class counsel's fee petition was based mostly on the value of the payout to the *cy pres* group, not the $227,334 slated to go to their actual clients, as, indeed, was the request of counsel for the Boyd Objectors for a $3.9 million fee.

Apart from that, as the PSC points out in its brief, because Bell Atlantic (Verizon) supplies telephone service to approximately 90% of Maryland residents, it is highly likely that most customers who paid a late fee and who continue to reside in Maryland remain customers of Bell Atlantic and thus, whether or not they filed a claim, will be part of the *cy pres* group that will receive the bulk of the payout not allocated to the lawyers. To that extent, there is a very significant overlap between the late fee payers and the *cy pres* group, and the two groups cannot be considered as entirely separate. Many, if not most, of the actual class members will be members of the *cy pres* group and will receive restitution benefits partly or entirely in that capacity.

It may well be that, by using the word "final" in various places in its November 22 order, the court intended that the order *be* a final one. The court's intention, however, is only one of the factors to be examined. The governing factor is whether the order, in fact, completed the final adjudication of all claims against all parties, and it clearly did not do so. Until the court enters a final order allocating the $12.5 million among counsel for the class, counsel for the various objectors, and the *cy pres* group, no one will know how much the *cy pres* group will receive as part of the settlement. Theoretically, the court could award anything from $1 to $12.5 million to counsel (and, conversely, anything from $1 to $12.5 million to the *cy pres* group), and there can be no reasonable determination of fairness and adequacy until that decision is made.

In that regard, this case is much different than those cited by petitioners, in which attorney's fees were awarded while the judgment on which they were based was under appeal or had already been resolved on appeal. *See Dent v. Simmons,*

61 Md.App. 122, 485 A.2d 270 (1985); *County Exec., Prince Geo's Co. v. Doe,* 300 Md. 445, 451 n. 4, 479 A.2d 352, 355 n. 4 (1984); *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford,* 307 Md. 1, 511 A.2d 1079 (1986). In each of those cases, *Dent* involving an award of fees against a party for bringing an action without substantial justification and the other two involving fees recoverable under 42 U.S.C. § 1988, the attorneys' fees were entirely collateral to and did not affect the amount payable to the plaintiffs. As noted, any award of fees in this case *does* affect the amount receivable by the *cy pres* group, which includes class members, on a dollar for dollar basis. It is *not* collateral.

This case also does not present the concern expressed by the Kamuhanda Objectors that a ruling by this Court that the approval order is not final would preclude review of actual adjudicatory judgments in class actions that involve a common fund to be allocated between the class and counsel until that allocation is made. Immediate review of such a judgment may or may not be precluded in that situation, but we need not address that issue here because that is not the situation now before us. This is a settlement, which is subject to court approval as to adequacy and fairness. The judgment in this case will not be an adjudication on the merits or, indeed, on the proper amount of restitution, but simply whether the ultimate settlement is adequate and fair, and, as we have indicated, that determination cannot finally be made until the allocation of the $12.5 million is resolved.

██ We turn, therefore, to petitioners' alternative argument that the order precluding them from commencing or continuing to assert claims covered by the settlement in any other tribunal constitutes an injunction immediately appealable under Maryland Code, § 12–303(3)(i) of the Cts. & Jud. Proc. Article. That section expressly permits an appeal from an order that grants an injunction, even an interlocutory one, so long as the appellant has filed an answer in the matter.

The non-objecting class, citing *LOOC v. Kohli,* 347 Md. 258, 266, 701 A.2d 92, (1997) and *Highfield Water Co. v. Wash. Co.*

*San. Dist.,* 295 Md. 410, 417, 456 A.2d 371, 374–75 (1983), urge that an order barring overlapping litigation "is not an injunction but rather a calendar order which the Circuit Court has plenary power to issue in the management of its own docket" and that such a stay is not immediately appealable. *Highfield* is not on point, and *LOOC* actually supports a contrary position.

*Highfield* involved a battle between the Highfield Water Company (HWC) and the Washington County Sanitary District (WCSD). In October, 1978, WCSD obtained an injunction from the Circuit Court permitting it to operate the water system for the town of Highfield. That was not appealed. In 1979, HWC sued the WCSD in Federal court claiming, among other things, that WCSD abused its administrative powers and seized HWC's property without due process. While that case was pending, WCSD filed a petition in the Circuit Court to condemn HWC's property. HWC responded with a motion challenging the jurisdiction of the court while the Federal action was pending and a motion to stay the condemnation proceeding. The court denied the stay, and HWC appealed, claiming that the request for stay was in the nature of a request for injunction and that the denial of that request was immediately appealable. We directed that the appeal be dismissed, concluding that "a trial court's refusal to stay its own proceedings until the conclusion of another court case pending between the same parties ordinarily does not constitute the denial of an injunction." 295 Md. at 416, 456 A.2d at 374.

*LOOC* involved an action for judicial review of an order of the Human Relations Commission directing a company to revise a policy of refusing to employ men with beards. The company sought a stay of the administrative order, which the court denied. The court subsequently ordered the company to comply immediately with that administrative decision. The company appealed that second order, contending that it was in the nature of an improperly entered interlocutory injunction. The Commission moved to dismiss the appeal on the ground that the order appealed from was no different from the earlier

order denying a stay, and that the appeal should have been taken from the earlier order. We found a significant distinction between the two orders. The order denying a stay of the administrative ruling "was in no sense an injunction," we held, as it was "not a court 'order mandating or prohibiting a specified act.'" *LOOC*, 347 Md. at 265–66, 701 A.2d at 95–96. The later order, on the other hand, did constitute an injunction, as it *did* mandate a specified act. *Id.* at 266–67, 701 A.2d at 96.

The order barring class members from pursuing their claims in any other forum clearly prohibits a specified act. Unlike a mere stay (or denial of stay) of pending proceedings in the court that issued the order, it is in no way a calendar order entered for the purpose of docket management. It affects neither the court's calendar nor its docket but prohibits specific external conduct, presumably under penalty of contempt, that the class members might otherwise take. *See State v. 91st Street Joint Venture*, 330 Md. 620, 625 A.2d 953 (1993). *See also* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, 16 FEDERAL PRACTICE AND PROCEDURE § 3923, at 123 (2nd ed. 1996) ("An order that prohibits a party from pursuing litigation in another forum unquestionably is an injunction for purposes of [28 U.S.C.] § 1292(a)(1))" [the Federal analog to Cts. & Jud. Proc. Art. § 12–303(3)(i)]; *Midwest Motor Express, Inc. v. Central States Southeast Pension Fd.*, 70 F.3d 1014 (8th Cir.1995), *cert. denied*, 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803; *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459 (Fed.Cir.1990).

█ Because the November 22 order itself is not a final judgment, however, no part of it is final. *See* Maryland Rule 2–602(a). The "anti-suit" provision is therefore interlocutory in nature, and therein lies the problem. A similar provision appeared in the orders preliminarily approving the first and second settlements.

The order barring class members from pursuing claims encompassed by the settlement in any other forum is, in effect, an implementation of the common law doctrine of claim

preclusion—*res judicata*—or its somewhat allied doctrine of release and settlement. Such an order is not necessary to implement those defenses—if any class members were to pursue such a claim in any other forum once there has been a final settlement and release, Bell Atlantic could certainly, and no doubt successfully, raise those defenses in that forum. One can imagine, however, why Bell Atlantic, or any other defendant in its position, would want such a specific bar as part of a court order approving a settlement agreement: it acts as an *in terrorem* provision to preclude class members from knowingly pursuing other actions and thereby lifts from the defendant the potential burden of having to defend those actions. The problem, however, is that claim preclusion and release—the only legitimate bases for such a provision—cannot come into play until the settlement and releases are final,. and, despite some of the language in the order, that has not yet happened.

The Notice sent to the class members makes that clear. It advised the class members that they would be forever barred from suing Bell Atlantic on released claims "[o]nce the Court has entered a non-appealable final judgment approving this Settlement." The order approving the settlement states that the class plaintiffs will be regarded has having released Bell Atlantic "upon the effective date," which is defined in the settlement agreement, incorporated into the order, as requiring the entry of a judgment that "must be Final." Until there is a final judgment, no claims have been released, and there is no basis for barring, under threat of contempt, other litigation concerning those claims. Thus, even if a "bar" provision such as that included in the order were generally permissible once the order is final, it is impermissible to purport to make such a bar effective prior to that time.[8]

---

8. Some commentators have urged caution in issuing anti-suit injunctions, both for reasons of comity and because an injunction issued against class members who have not been served with process might present due process questions. *See* Alba Conte and Herbert Newberg, 3 & 4 Newberg on Class Actions §§ 9:26 at 366–68 and 13:26 at 422 (4th ed. 2002); Geoffrey P. Miller, Overlapping Class Actions, 71 N.Y.U. L.

It is evident, then, that the part of the order that bars class members from further pursuing claims covered under the settlement in any other forum is in the nature of an immediately appealable injunction and that the Circuit Court erred in purporting to make such an injunctive order effective prior to the entry of a final judgment approving the settlement as adequate and fair.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO ENTER JUDGMENT (1) VACATING ORDER OF CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY BARRING CLASS MEMBERS FROM PURSUING CLAIMS IN OTHER FORA, (2) OTHERWISE DISMISSING APPEAL, AND (3) REMANDING CASE TO CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID 3/4 BY PETITIONERS AND 1/4 BY RESPONDENTS.

Rev. 514, 523–25 (1996). Whether that caution, or the basis for it, is valid at all or, if valid, has relevance in the context of a settlement as opposed to an adjudicatory judgment, has not been raised in this appeal, and we therefore need not address it.